**Robert G. MORRIS et al.,
Plaintiffs,**

**v.**

**Sol W. CANTOR et al.,
Defendants.**

**No. 74 Civ. 2496.**

United States District Court,
S. D. New York.

March 4, 1975.

Bader & Bader, New York City, for plaintiffs; I. Walton Bader, New York City, of counsel.

White & Case, New York City, for defendant Bankers Trust Co.; Laura Banfield, New York City, of counsel.

ROBERT J. WARD, District Judge.

Plaintiffs Robert G. Morris, Israel Patents Corporation and Patents Management Corporation, calling themselves the "Protective Committee of 4% Convertible Subordinated Debentures of Interstate Department Stores, Inc.," bring this action on behalf of themselves and all others similarly situated ("the bondholders"). The complaint alleges that the several defendants violated provisions of the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa et seq. ("the Act") and the Securities Act of 1933, 15 U.S.C. § 77a et seq. ("the Securities Act"), and breached their common law fiduciary obligations to the bondholders, in connection with various loans to defendant Interstate Department Stores, Inc. ("the Company") during 1972.

The Bankers Trust Company ("the Bank") which is charged with violations of the Trust Indenture Act and breach of fiduciary obligations, moves pursuant to Rule 12(b), Fed.R.Civ.P., to dismiss the complaint against itself for failure to state a claim upon which relief can be granted. For the reasons discussed below, the motion is denied.

The Company issued $20,000,000 in 4% convertible subordinated debentures under an indenture agreement dated August 1, 1967, in which the Bank was named Trustee. The indenture agreement was duly registered with the Securities and Exchange Commission ("the Commission"), and its terms conformed to the requirements of the Act. The debentures were by their terms unsecured and subordinated to all "senior indebtedness" of the issuer, as that term was defined in the indenture agreement, including any which might be later acquired. The indenture agreement provided that should the indenture trustee be or become a creditor of the issuer, the trustee would be entitled to the benefit of the subordination provisions of the indenture with respect to senior indebtedness to the same extent as any other holder of such indebtedness.

The complaint alleges that the Bank, while Trustee, acted as lead bank in negotiating the extension of a $90,000,-000 line of credit to the Company, which qualified as senior indebtedness with respect to the debentures. The Bank thus became a preferred secured creditor of the Company, with priority over the bondholders, in the event of bankruptcy. Plaintiffs concede that the loan was not consummated until after the Bank resigned as Trustee, and in any event, not even negotiated within four months prior to a default in payment of the principal or interest under the indenture. They contend, however, that the Bank's action constituted "willful misconduct" within the meaning of § 315(d) of the Act, 15 U.S.C. § 77ooo(d).

This Court's jurisdiction of the controversy between plaintiffs and the Bank is based exclusively upon the Trust Indenture Act, 15 U.S.C. § 77vvv, which provides:

> "Jurisdiction of *offenses and violations under,* and jurisdiction and venue of suits and actions brought to enforce *any liability created by,* this subchapter, or any rules or regulations or orders prescribed under the authority thereof, shall be as provided in section 77v(a) of this title [the Securities Act of 1933]." (emphasis added)

A threshold question therefore is whether the Act by its terms creates any liability for violation of the provisions of indentures qualified thereunder, or more generally for willful misconduct on the part of a trustee appointed according to the Act's provisions. A second question is whether there exists a civil

right of action so that the bondholders may enforce such liability. Neither of these questions has yet been decided by the courts. The final question presented to the Court by this motion is whether, assuming it is proven, the conduct alleged constitutes a violation of the Act.

The unique structure of the Act creates the first question, whether by its terms it imposes any obligations upon the indenture trustee. The Act requires that any indenture agreement under which an issue of over $1,000,000 is offered to the public be registered with the Commission and contain certain terms which the Act carefully specifies. Thus, section after section of the Act begins with the language, "The indenture to be qualified [shall] provide . . . " or "shall require . . . " or "shall contain provisions requiring . . . " and continues with detailed and often technical terms pertaining to the naming of the trustee, qualifications of eligible trustees, required reports to bondholders or from the obligor to the trustee, duties of the trustee both prior to and in the event of default, or in the event of its acquiring conflicting interests. Other sections are permissive in language, substituting the language ". . . may require . . .". The particular section at issue here reads:

> "The indenture to be qualified shall not contain any provisions relieving the indenture trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct ; . . ."
> 15 U.S.C. § 77 *ooo*(d).

Once the indenture is registered, the Commission has no power to enforce its provisions. 15 U.S.C. § 77iii(e). While the Act gives the Commission general rule making and investigative authority, it limits that authority to matters involving qualification of the indenture and required reports. 15 U.S.C. § 77sss, ttt, and uuu. The only civil liability expressly imposed is for material misstatement or omission in any report filed with the commission pursuant to the Act, in connection with the qualification of the indenture or thereafter. 15 U.S.C. § 77www.

Prior to the Act's passage, indenture agreements, as private contracts, had been governed by the common law of contracts and fiduciary obligations, articulated primarily in the state courts.[1] To the extent that such common law had developed independently in the federal courts in the exercise of diversity jurisdiction, it had recently been declared inapplicable in Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[2] Of the substantial body of law which had evolved defining rights of bondholders and trustees, some addressed the specific question of what constitutes willful misconduct on the part of the indenture trustee.[3] But trustees under such indenture agreements had developed a widespread practice of contractually limiting their liability for performance of their trust functions, and courts enforced these terms of limitation in many instances.[4]

Thus, the scheme of the Act is to regulate in a limited fashion by taking a type of private contract, requiring that it contain certain terms and be

1. See generally, Annot., Duty and liability of trustee under mortgage, deed of trust, or other trust instrument, to holders of bonds or other obligations secured thereby, 90 A. L.R.2d 501 (1963), citing earlier cases, but superseding 57 A.L.R. 468 (1928) and 71 A. L.R. 1413 (1931).

2. York v. Guaranty Trust Co. of New York, 143 F.2d 503, 519-20, 528 (2d Cir. 1944), applying state substantive law, rev'd on other grounds, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) ; In re Baltimore & O. R. Co., 34 F.Supp. 154, 163 (D.Md.1940) ; *see*

*also*, Browning v. Fidelity Trust Co., 250 F. 321 (3d Cir. 1918), cert. denied, 248 U. S. 564, 39 S.Ct. 9, 63 L.Ed. 423 (1918).

3. *E. g.*, York v. Guaranty Trust Co., *supra*; Fleener v. Omaha Nat. Co., 131 Neb. 253, 267 N.W. 462 (1936) ; Green v. Title Guarantee & Trust Co., 223 App.Div. 12, 227 N. Y.S. 252, aff'd 248 N.Y. 627, 162 N.E. 552 (1928) ; Hollister v. Stewart, 111 N.Y. 644, 19 N.E. 782 (1889).

4. Benton v. Safe Deposit Bank, 255 N.Y. 260, 174 N.E. 648 (1931) ; Hazzard v. Chase

registered with the Commission, and that the parties disclose certain information, and precluding the Commission from enforcing those terms. The Bank argues that the contract itself remains a private contract, enforceable only in the state courts or under the diversity jurisdiction of this Court, and that the only "liability created by the statute" within the meaning of its jurisdiction granting section, 15 U.S.C. § 77vvv, is for failure to include the requisite terms in the contract, or for failure to register it as required by the Act, or for material misstatements in connection with that registration, or misrepresentation of the effect of registration. Plaintiffs contend that the Act, albeit indirectly, imposes substantive obligations upon the trustee and therefore creates liability enforceable in this Court for violation of any of the terms of the contract itself which are required under the Act, as well as for those common law obligations of trusteeship which the Act prohibits the contract from abridging.

■ The legislative history does not speak directly to the question, but upon careful reading persuades the Court that the Act creates substantive liabilities in those areas it specifically addresses.

A study conducted by the Commission in 1936 had revealed widespread abuses in the corporate issuance of bonds under indenture agreements. Securities and Exchange Commission, Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees, Part VI, Trustees Under Indentures (1937), (hereinafter referred to as "S.E.C. Report"). The trustees who negotiated and signed the agreements on behalf of the bondholders frequently did not represent the interests of bondholders, either because they possessed ties to the issuer which created conflicts of interest, or because, in their own behalf, they included in the agreements clauses exculpating them from any liability arising from their performance of their trust function. S.E.C. Report at 2–9, 68–70. The agreements frequently limited the express obligations of the trustee to the bondholders, such as to obtain information concerning the company, to notify the bondholders of a default, or to take affirmative action in case of a default. The bondholders themselves, widely scattered, could only with difficulty obtain such information or unite to enforce their rights under the agreement. The courts, according to the Commission, enforced the contract terms as reflective of the intent of the parties, despite the inability of the bondholders to dictate any of the contract's terms, and did not apply the usual standards of fiduciary obligations where the contract expressly limited the trustee's liability. S.E.C. Report at 5–6.

The Commission, accordingly, determined that the abuses could be cured by operating directly upon the trust instrument which was seen as the source of the difficulty.

"The basic problem is to refashion the trust indenture for the purpose of according greater protection to investors. That entails prescribing certain minimum standard specifications for the conduct of trustee and issuer thereunder. As in the case of other contracts involving persons not capable nor in a position to protect themselves, the contents of the trust can no longer be left to the conventions of the issuer, the trustee or the underwriter." *Id.* at 6.

The Congressional reports reflect the same general concern. Senate Committee on Banking and Currency, Report on Trust Indenture Act of 1939, Sen.Rep. No. 248, 76th Cong., 1st Sess. (1939) (hereinafter referred to as "Senate Report"). At 1–10. H.R. Committee on

Nat. Bank, 159 Misc. 57, 287 N.Y.S. 541 (Sup.Ct.1936), aff'd, 257 App.Div. 950, 14 N.Y.S.2d 147 (1939), aff'd, 282 N.Y. 652, 26 N.E.2d 801 (1940), cert. den., 311 U.S. 708,

61 S.Ct. 319, 85 L.Ed. 460 (1940); Gouley v. Land Title Bank & Trust Co., 329 Pa. 465, 198 A. 7 (1938).

Interstate and Foreign Commerce, Report on Trust Indenture Bill of 1939, H.R.Rep.No. 1016, 76th Cong., 1st Sess. (1939) (hereinafter referred to as "House Report"). At 23–28. Moreover, they specifically emphasize the national scope of the problem. The Senate Report states:

"To the extent that the types of trust indenture now in common use are inadequate, it is clear that such inadequacy presents a national problem which cannot be dealt with effectively by the Senate, for it is conservatively estimated that more than 40 billions of securities which have been nationally distributed are now outstanding under trust indentures, and in the 2 years and 8 months ended December 31, 1938, over 4¼ billions of additional securities which would have been affected by this bill were registered under the Securities Act. Although the Commission's actual registration records show that New York and Chicago institutions were awarded trusteeships under 80.2 percent in dollar amount of all such issues of more than $1,000,000, and that the inclusion of institutions located in 7 other financial centers brings this percentage up to 95.0 percent, the securities themselves were nationally distributed to the investing public by use of the mails or in interstate commerce." Senate Report at 3–4. *See also*, House Report at 25.

One reason for the legislative approach of acting upon the indenture agreement, rather than imposing duties directly upon the trustees which the Commissions would police and enforce, emerges in the House Committee hearings. Hearings on H.R. 2191 and H.R. 5220 before a Subcommittee of the Committee on Interstate and Foreign Commerce, House of Representatives, 76th Cong., 1st Sess. (1939), ("Hearings"). *See, e. g.*, pp. 65–82, 87, 92–93.

Banking institutions which frequently acted as trustees registered vigorous opposition to further regulation of business under what they called the "dominion theory." They viewed the Commission as a new agency seeking to expand its regulatory role and increasingly to encroach upon private business, and the registration procedures as so time consuming and costly that necessary financing would cease to be available. The Senate Report was careful to state:

"The bill proceeds on the theory that the proper remedy is to correct these deficiencies in the trust indenture, and that the appropriate time to correct those deficiencies is before the bonds are offered in interstate commerce or through the mails. If this is done, it is believed that the enforcement of the provisions of the indenture may appropriately be left to the bondholders themselves, without continuing supervision by a governmental agency." Senate Report at 8. *See also*, House Report at 26.

The House Report, in addition to repeating the language of the Senate Report, explicitly rejected alternative remedies to the abuses it noted, at 25–26. It added:

"The standards prescribed by the bill affect only those indenture provisions which relate to the protection and enforcement of the rights of the investors. They do not affect the strictly 'business' features of indentures, such as the wisdom of the issue or the amount of security to be given therefor, or the offering price, maturity date, interest rate, or sinking-fund provisions.

The Commission's only funtion will be to see that the terms of each indenture conform to the prescribed standards.

The Commission's work will be completed when the form of indenture has been qualified under the bill, except for the rule-making power conferred upon it by section 314(a) with respect to periodic reports and summaries thereof, which is discussed in paragraph 8, on page 13 of this report. The Commission will have no powers with respect to the enforcement of the provisions of the indenture. After the indenture has been executed it will

be enforceable only by the parties, like any other contract." *Id.* at 26–27. Moreover, it noted, among the differences between the earlier Senate bill, and the later Committee version, the elimination of several elements of administrative "discretion" in formulating the standards to evaluate the trustee's performance of its duties. *Id.* at 30 et seq.

■ Thus, the legislative history suggests that Congress considered the existing body of common law sufficient to protect investors, so long as the trustee was precluded from contractually limiting the duties it imposed upon fiduciaries, and so long as he explicitly assumed particular duties. As the House Report, at 26, stated, ". . . the deficiencies in corporate trust practice are largely due to deficiencies in the trust indenture itself. . . ." and the remedy Congress chose was simply to state precisely which terms were required, permitted and prohibited in the contract. It viewed the problem as nationwide in scope and sought a nationwide solution. The format it chose, by which the indenture agreement remained a contract between the parties, the rights and obligations it set forth enforceable only by the parties in the courts, simultaneously limited the degree of Commission intrusion into the every day or business aspects of the indentures. Accordingly, this legislation must be viewed as an indirect method of imposing nationally uniform and clearly defined obligations upon those associated with the issuance of corporate debt. The Court holds that the statute thereby "created liability" as surely as though it had directly required the same actions and standards of behavior of trustees and obligors, and consequently in 15 U.S.C. § 77vvv conferred upon the district courts jurisdiction over suits brought to enforce that liability. The jurisdiction granting formula which Congress chose effectively empowers the district court to rule on those questions

of interpretation and enforcement of the indenture agreement to which the statute is specifically addressed, leaving the purely business aspects to state regulation, or to the pendent jurisdiction of the district courts.[5]

■ The existence of a private right of action follows, *a fortiori.* This is not the situation where Congress has imposed liability but expressly created only criminal or administrative enforcement procedures, and the courts imply a civil right of action. *See, e. g.,* Kardon v. National Gypsum Co., 69 F.Supp. 512 (E.D.Pa.1946); on the merits, 73 F. Supp. 798 (E.D.Pa.1947); on requests for additional findings, 83 F.Supp. 613 (E.D.Pa.1947); and see generally, III Loss, Securities Regulation 1757 et seq. (1961). Here, instead, Congress expressly anticipated that any liability indirectly imposed would be enforced by private civil actions, and specifically excluded the Commission from an enforcement role.

In Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), the Supreme Court recognized the possibility of such a right of action. Although that case did not decide the question, several footnotes strongly suggest that bondholders wronged by willful misconduct of an indenture trustee under an agreement registered according to the Act, are granted a remedy by § 77*ooo*(d). *See id.* at notes 5, 18, 19. Subsequently, a judge of this Court, although still not deciding the question, has permitted amendment of pleadings to state such a claim. Lewis v. Marine Midland Grace Trust Co., 63 F.R.D. 39 (S.D.N.Y.1973).

The statutory language itself reflects Congress' intention that there be such a right. 15 U.S.C. § 77*ooo*(e) provides that the indenture may contain terms by which the parties "agree that the court may in its discretion require, in any suit for the enforcement of any right or remedy under such indenture,

5. Of course since the jurisdiction section of the Securities Act, referred to in 15 U.S.C. § 77vvv(b), grants the district courts concurrent jurisdiction over suits at law and eq-

uity to enforce any liability created by the statute, 15 U.S.C. § 77v(a), the state courts may also interpret these terms in qualified indenture agreements.

or in any suit against the trustee for any action taken by it a strustee. . . ." the filing of an undertaking for costs.

Since this Court has found that the statute was intended to create liability for breach of the indenture provisions, and for breach of fiduciary obligations which it expressly preserved from limitation by contract, and since, consequently, this Court has jurisdiction to enforce such liability, bondholders alleging such a breach may bring their actions in this Court.

█ The Bank argues that nevertheless, on the facts alleged, plaintiffs have not stated a claim upon which relief can be granted. It contends that the Act addresses the situation of the trustee-creditor in clear terms in 15 U.S.C. § 77kkk, and that if a trustee's actions as creditor of the obligor on the bonds do not violate that section, they cannot be considered willful misconduct within the meaning of § 77ooo. The parties agree that the · Bank's action does not constitute a violation of § 77kkk.

The Act requires that qualified indenture agreements contain provisions for disqualification of the institutional trustee upon the occurrence of certain enumerated conflicts of interest, thus in effect prohibiting those conflicts. § 77jjj. Its creditor relationship to the obligor on the bonds is not among these conflicts. Rather, the Act requires merely that the indenture provide that the trustee who is also a creditor within four months prior to any default on the bonds, or at any time thereafter, and who receives any preferential payment as a creditor, shall hold the proceeds for distribution to the bondholders. § 77kkk. The Bank reads this requirement as an implied permission for it to be simultaneously trustee under the indenture agreement and creditor of the obligor, and further, for it to become even a preferred creditor of the obligor while it is trustee.

The legislative history supports the Bank's interpretation, revealing that Congress explicitly considered the problems of conflicting interest that might

arise in such a circumstance. The S.E.C. Report condemned the practice of a bank simultaneously acting as trustee and creditor, Report, *e. g.* at 84, 90, 98, 107, while, however, noting that the period of greatest danger to the interests of the bondholders was immediately prior to a default. *Id.* at 98. But spokesmen for several banks testified before the House Committee, emphasizing that it was often in the interest of a company and its bondholders· that credit be available to sustain the company as a going concern, and that frequently the bank most familiar with the affairs of the company and most willing to advance credit was also the indenture trustee. *See, e. g.,* Hearings, at 159–60, 170–71, 268–9. Congress determined to protect the interests of the bondholders, without prohibiting such a dual relationship, by providing that any preferential collection which the trustee as creditor should make in the four months prior to default, when it should have a clear idea of the precarious position of the company, be held for the benefit of the bondholders. As the House Report described the effect of this provision:

### M. BURTMAN

"And, where the trustee is also a creditor of the obligor, section 311 of both bills *prevents the trustee from improving its own creditor position at the expense of the bondholders, within 4 months prior to a principal or interest default under the indenture or after such a default."* (emphasis added). House Report, *supra* at 34.

The Court therefore concludes that the mere existence or creation of a dual relationship, as trustee under the indenture and as preferred creditor of the obligor on the bonds, although there may be an inherent conflict of interest, does not of itself constitute a violation of § 77ooo(d). Congress specifically dealt with this inherent conflict when drafting the bill, in such a way as to permit it, with certain named protections for the interests of the bondholders. Having so prescribed contract terms ad-

dressed to this subject, it removed this conduct from the area of residual liability which could not be limited by contract, set forth in § 77ooo(d).

That area of residual liability, however, is defined by the common law as it had developed prior to the statute and has developed since. Willful misconduct encompasses knowing, intentional action in flagrant disregard of the interests of the bondholders. *See* Notes 1–4, *supra.* While the mere making of a loan to the Company, protected under § 77kkk, cannot be such willful misconduct as the statute contemplates, it is possible that in the circumstances known to the Bank, to negotiate such a loan did constitute knowing, intentional action in flagrant disregard of the interests of the bondholders. Were these facts developed during discovery and at trial, plaintiffs would have stated a claim upon which relief can be granted under the statute. Accordingly, the Court considers it premature to dismiss the complaint.

Defendant Bankers Trust Company's motion to dismiss the complaint is denied.

It is so ordered.