Jay A. ZEFFIRO, Individually and on behalf of all other persons similarly situated,

v.

FIRST PENNSYLVANIA BANKING AND TRUST COMPANY.

Harry M. BERNARD, Jr., on behalf of himself and all others similarly situated,

v.

FIRST PENNSYLVANIA BANK, N. A., and Capital First Corporation.

Civ. A. Nos. 78–3294, 78–4316.

United States District Court,
E. D. Pennsylvania.

June 28, 1979.

202

Richard A. Finberg, Michael P. Malakoff, Pittsburgh, Pa., James P. Larkin, Minneapolis, Minn., Abraham C. Reich, Philadelphia, Pa., for plaintiffs.

Edward F. Mannino, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the Court are the motions of the defendant First Pennsylvania Bank, N.A.[1] ("First Pennsylvania"), to dismiss for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1), and to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, the motions will be denied.

---

[1]. In the Zeffiro action, the defendant is stated to be "First Pennsylvania Banking and Trust Company." This is a predecessor of "First Pennsylvania Bank, N.A.," and this error is not urged as a ground for dismissal by First Pennsylvania Bank, N.A.

## FACTUAL BACKGROUND

In 1972, Capital Equipment Leasing Corporation, a predecessor of defendant Capital First Corporation ("Capital"), issued $1,500,000 principal amount, 9% subordinated debentures with a maturity date of May 31, 1982 ("the debentures"). The debentures were issued under a trust indenture which named First Pennsylvania Banking and Trust Company, a predecessor of First Pennsylvania, as indenture trustee. It is alleged that the debenture issue was subject to the qualification requirements of the Trust Indenture Act of 1939 ("the Act"), 15 U.S.C. §§ 77aaa—77bbbb, and the Court will assume, for the purpose of the instant motions, that the issue was so qualified. Pursuant to the requirements of the Act, the indenture contained numerous provisions detailing the duties of First Pennsylvania toward the debenture holders. In December of 1976, Capital defaulted on its obligation to pay interest on the debentures and, subsequently, filed a petition under Chapter XI of the Bankruptcy Act on December 19, 1978.

On September 29, 1978, plaintiff Jay Zeffiro ("Zeffiro") filed a class action complaint against First Pennsylvania, alleging jurisdiction under § 322 of the Act, 15 U.S.C. § 77vvv(b), which incorporates by reference the concurrent jurisdictional section of the Securities Act of 1933. *See* 15 U.S.C. § 77v(a). Zeffiro, as an owner of the debentures in the amount of $5,000, seeks to represent all persons who at any time owned any of Capital's 9% subordinated debentures due in 1982. Zeffiro alleges that: (1) First Pennsylvania violated § 311 of the Act, 15 U.S.C. § 77kkk, and § 6–13 of the indenture by failing to account to the debenture holders for certain funds it received from Capital as part of a separate and subsequent loan transaction; (2) First Pennsylvania violated § 313 of the Act, 15

U.S.C. § 77mmm, and § 7–13 of the indenture because, even if such an account was created, the debenture holders were not notified of such action; (3) First Pennsylvania breached its contractual and fiduciary obligations by its failure to obtain certain security for the benefit of the debenture holders; and, (4) First Pennsylvania breached a confidential trust and was negligent.

On December 27, 1978, plaintiff Harry M. Bernard [2] ("Bernard") filed a class action complaint against First Pennsylvania and Capital, alleging jurisdiction under the Act [3] and invoking the pendent jurisdiction of the Court. In addition to various claims against Capital which are not relevant here, Bernard, as owner of debentures in the amount of $12,000, alleges that First Pennsylvania violated the Act and the indenture by its failure to provide certain notifications and reports to the debenture holders' benefit.

On January 5, 1979, the Court ordered the consolidation of the Zeffiro and Bernard actions for all purposes, pursuant to Fed.R. Civ.P. 41. Pursuant to the provisions of the Bankruptcy Act, all proceedings are stayed against Capital, absent permission to proceed from the bankruptcy court.

First Pennsylvania acknowledges that the debenture holders may allege common law causes of action for breach of trust and breach of contract, but contends that the Act does not expressly provide for a federal cause of action or for federal jurisdiction and that, therefore, the debenture holders' suit must be brought in state court. In the alternative, First Pennsylvania argues that the action is barred by the one-year period of limitation established by the Act for the bringing of suits to establish liability under its express liability section. *See* § 323, 15 U.S.C. § 77www.

The debenture holders contend that, whereas the Act does not expressly provide

---

**2.** Isabella G. Smith was an additional plaintiff in the Bernard action, but was voluntarily dismissed, pursuant to Fed.R.Civ.P. 41(a) and 23(e), by Order of Court on March 13, 1979.

**3.** Bernard also alleged jurisdiction under the National Bank Act, 12 U.S.C. § 2(a). Counsel

has not addressed the issue of whether this section vests this Court with jurisdiction and, in light of our conclusion that this Court does have jurisdiction under the Trust Indenture Act, we need not address the National Bank Act.

a cause of action in their favor, the Court should imply a federal remedy because the Act "creates" liability in that it mandates the terms of the indenture. Secondly, they argue that the one-year period of limitation urged by First Pennsylvania applies, by its very terms, only to suits brought for false and misleading statements in documents filed with the Securities and Exchange Commission ("SEC"), and that the Court must look to state law for the analogous period of limitation.

## IMPLIED CAUSE OF ACTION

We are squarely presented with the question of whether there is a federal cause of action in favor of debenture holders against a trustee for breach of the provisions of an indenture, when those provisions are governed by the Trust Indenture Act. Although it is clear that debenture holders would have a cause of action for breach of trust cognizable in state court, we must determine whether such an action is within the jurisdictional grant of the Act. Although the Act has been in existence for many years, this question has only been addressed on several occasions. In *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), the Supreme Court assumed *arguendo* that bond holders could allege a federal cause of action against a trustee, *Id.*, at 406 n. 17, 433 n. 23, but held that the defaulting issuer's trustee in bankruptcy did not have standing under the Bankruptcy Act to assert those claims. *Id.*, at 434. *See also Caplin v. Marine Midland Grace Trust Co.*, 439 F.2d 118, 123 n. 5 (2d Cir. 1971).

The first case to hold that debenture holders could allege a federal cause of action was *Morris v. Cantor*, 390 F.Supp. 817 (S.D.N.Y.1975). The *Morris* court noted that the legislative history of the Act indicated that Congress was concerned with serious abuses of the trust indenture as an instrument of corporate finance, *Id.*, at 820, and was cognizant of the national scope of the problem. *Id.*, at 822. The court concluded by stating:

[T]his legislation must be viewed as an indirect method of imposing nationally uniform and clearly defined obligations upon those associated with the issuance of corporate debt. The Court holds that the statute thereby "created liability" as surely as though it had directly required the same actions and standards of behavior of trustees and obligors    . . . .

*Id.* The court, therefore, held that the Trust Indenture Act vested federal courts with jurisdiction to enforce the terms of trust indentures. *Id.*, at 833.

The *Morris v. Cantor* holding was followed without discussion in *In re Equity Funding Corp. of America Securities Litigation*, 416 F.Supp. 161 (C.D.Cal.1976). *See also Lewis v. Marine Midland Grace Trust Co.*, 63 F.R.D. 39 (S.D.N.Y.1973). However, subsequent developments in the law in terms of the creation of implied causes of action convince us that the *Morris v. Cantor* holding must be reexamined. *Clark v. Gulf Oil Corp.*, 570 F.2d 1138, 1148 (3d Cir. 1977), *cert. denied*, 435 U.S. 970, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978).

In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court articulated four factors to be considered when a court is asked to imply a cause of action:

In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.*, at 78, 95 S.Ct. at 2088 (citations omitted). The Court notes that a private remedy will not be implied in the context of

every federal statute, *Polansky v. Trans World Airlines, Inc.*, 523 F.2d 332 (3d Cir. 1975); *Rauch v. United Instruments, Inc.*, 548 F.2d 452, 456 (3d Cir. 1976); *Wolf v. Trans World Airlines, Inc.*, 544 F.2d 134 (3d Cir. 1976), and that *Cort* has been characterized as having "severely limited the circumstances in which a federal court may imply a private cause of action from a federal statute." *Chrysler Corp. v. Schlesinger*, 565 F.2d 1172, 1188 (3d Cir. 1977).

## TRUST INDENTURE ACT

A study was conducted in 1936 by the SEC, pursuant to a statutory mandate, 15 U.S.C. § 78jj, which revealed widespread abuses in the issuance of corporate bonds under indentures.[4] *See* Securities and Exchange Commission Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees, Part IV, Trustees Under Indentures (1937) ("SEC Report"). The report made it clear that indenture trustees frequently did not represent the interests of the debenture holders but were more closely identified with the issuer and were protected by broad exculpatory clauses in the indenture. SEC Report at 2–9, 68–70. The debenture holders were often widely scattered and had difficulty enforcing their rights under indentures. SEC Report at 5–6. Furthermore, courts often enforced indenture terms as written, rather than applying the traditional standards of fiduciary duty. *Id.*

The problem was seen as being national in scope in light of the large volume of debt securities traded on national exchanges. *See* Senate Committee on Banking and Currency, Report on the Trust Indenture Act of 1939, S.Rep.No.248, 76th Cong., 1st Sess. 3–4 (1939) ("Senate Report"); H.R.Rep.No. 1016, 76 Cong., 1st Sess. 25 (1939) ("House Report"). Although it was clear that a nationwide solution, which would establish clearly defined obligations, was needed, there was concern that additional federal intrusions into capital markets would be

4. For a summary of abuses, *see* Hearings on H.R. 10292 Before a Subcommittee of the Committee on Interstate and Foreign Commerce,

dangerous at a time when the Nation needed to revitalize those markets. Hearings on H.R. 10292 Before a Subcommittee of the Committee on Interstate and Foreign Commerce, 75th Cong., 3rd Sess. 31–32 (1938) (statement of SEC Commissioner Douglas) ("House Hearings"). Furthermore, there was vigorous opposition by banking institutions to additional regulation of business, *Morris v. Cantor, supra*, 390 F.Supp. at 821, and there was concern that the SEC might become involved in the purely business aspects of bond issues. 84 Cong.Rec. 5013–14 (1939) (remarks of Sen. Taft); House Hearings at 19 (statement of Commissioner Douglas).

There were various methods by which Congress could have attempted to solve the problems outlined in the SEC Report. House Hearings at 34. Rather than statutorily standardize the trustee's behavior directly, *Id.*, the Act established the standard of behavior indirectly by refashioning the indenture itself. SEC Report at 6.

The structure of the Act is as follows: Before debt securities not exempted from the Act may be offered to the public, the indenture under which they are issued must be "qualified" by the SEC. With respect to securities subject to the registration requirements of the 1933 Act, the indenture is deemed "qualified" when registration becomes effective. § 309, 15 U.S.C. § 77iii. The SEC will permit the registration to become effective if it finds, *inter alia*, that: (1) the security has been issued under an indenture; (2) that the person designated as trustee is eligible to so serve, § 305, 15 U.S.C. § 77eee(b); and, (3) the indenture conforms to the requirements of §§ 310 through 318, 15 U.S.C. §§ 77jjj–77rrr.

With respect to securities not required to be registered under the 1933 Act, the indenture will be deemed "qualified" once the SEC permits the "application for qualification" to become effective. § 309(a)(2), 15 U.S.C. § 77iii(a)(2). In any event, the indenture must conform to the requirements of §§ 310 through 318.

75th Cong., 3rd Sess. 20 (1938) (summary submitted by Commissioner Douglas).

Sections 310 through 318 form the core of the Act in that they outline the substantive duties that the indenture must impose on the trustee. These sections are of three types. The first type is proscriptive in nature, prohibiting certain terms. For example, § 315, 15 U.S.C. § 77ooo(d), prohibits provisions in the indenture which would relieve or exculpate the trustee from liability for negligence. The second type of section is merely permissive in nature. An example of this type of section is § 315(a), 15 U.S.C. § 77ooo(a)(1), which states that the indenture *may* contain a provision relieving the trustee of liability except for the performance of such duties as are specifically set out in such indenture.

The third type of section, and the most important for our purposes, is mandatory and prescriptive in nature. These sections begin with the phrase "the indenture to be qualified *shall* provide" or "shall require." An example of this type of section is § 311, 15 U.S.C. § 77kkk, which states that the indenture *shall* require the trustee to establish certain accounts for the benefit of bond holders in the event the trustee also becomes a creditor of the issuer and the issuer defaults on the bonds.

Once the registration becomes effective, the SEC has no enforcement authority and cannot issue a stop order for a violation of the indenture provisions by a trustee, § 309, 15 U.S.C. § 77iii(e), but is limited to exercises of general rulemaking and investigatory authority. 15 U.S.C. §§ 77ddd(c), (d), (e); 77eee(a), (c); 77ggg; 77sss; 77ttt. Moreover, the only express civil liability [5] established by the Act is found in § 323, which states in part:

(a) Any person who shall make or cause to be made *any statement in any application, report, or document filed with the Commission* pursuant to any provisions of this subchapter, or any rule, regulation, or order thereunder, which statement was at the time and in the light of the circumstances under which *it was made false or misleading with respect to any material fact,* or who shall omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall be liable to any person (not knowing that such statement was false or misleading or of such omission) who, in reliance upon such statement or omission, shall have purchased or sold a security issued under the indenture to which such application, report, or document relates, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading or of such omission.

15 U.S.C. § 77www (emphasis added). The Act does, however, provide for criminal liability for certain willful violations and misrepresentations. § 325, 15 U.S.C. § 77yyy.[6]

The general jurisdictional grant of the Act is found in § 322, which states:

---

5. Section 324 states:

It shall be *unlawful* for any person in offering, selling or issuing any security to represent or imply in any manner whatsoever that any action or failure to act by the Commission in the administration of this subchapter means that the Commission has in any way passed upon the merits of, or given approval to, any trustee, indenture or security, or any transaction or transactions therein, or that any such action or failure to act with regard to any statement or report filed with or examined by the Commission pursuant to this subchapter or any rule, regulation, or order thereunder, has the effect of a finding by the Commission that such statement or report is true and accurate on its face or that it is not false or misleading.

15 U.S.C. § 77xxx (emphasis added). While this section does contain a prohibition, it does not expressly provide for criminal or civil liability and is not directly relevant.

6. Section 325 states:

Any person who willfully violates any provision of this subchapter or any rule, regulation, or order thereunder, or any person who willfully, in any application, report, or document filed or required to be filed under the provisions of this subchapter or any rule, regulation, or order thereunder, makes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or both.

15 U.S.C. § 77yyy.

(b) Jurisdiction of offenses and violations under, and jurisdiction and venue of suits and actions brought to enforce *any liability created by, this subchapter*, or any rules or regulations or orders prescribed under the authority thereof, shall be as provided in section 77v(a) of this title.

15 U.S.C. § 77vvv(b) (emphasis added). Incorporated by reference, is the jurisdictional section of the Securities Act of 1933, 15 U.S.C. § 77v(a), which provides for concurrent jurisdiction in state and federal court for all suits in equity and actions at law.[7]

The debenture holders contend that this Court has jurisdiction over their claims because they are relying on provisions mandated by the Act. Therefore, they are seeking to enforce "liability created by" the Act within the meaning of § 322. First Pennsylvania argues in response that there is no express provision for a federal cause of action and that we should not create an implied remedy because Congress intended that, absent diversity of citizenship, enforcement suits be brought in state court. We note that this is not a statute which is primarily criminal in nature or one that is manifestly designed to protect the public in general. Rather, it is clear that the rights of debenture holders are articulated in the Act. The question before us is whether these rights give rise to liability "created" by the Act within the meaning of the jurisdictional grant. While this would seem to be a question of pure statutory interpretation—*i. e.*, defining the word "created" as used in the jurisdictional grant—the parties urge the Court to employ the *Cort v. Ash* implied-cause-of-action analysis. The Court will employ this implied-cause-of-action analysis, despite its doubts about its complete applicability, because the *Cort v. Ash* analysis is comprehensive and includes, by necessity, an examination of the statute's structure.[8]

The threshold question under *Cort* is whether the Trust Indenture Act was enacted for the benefit of a special class of which the debenture holders are members. *Id.*, at 80–82, 95 S.Ct. 2080. An examination of the statutory language, 15 U.S.C. § 77bbb(a)(1)–(6), and an analysis of the relevant legislative history, Senate Report, at 1–6; House Report at 25, make it clear that Congress sought to protect debenture holders from breaches of fiduciary duty by trustees in the performance of their duties under an indenture. This goal was noted in *In re Pittsburgh & Lake Erie Railroad Co. Securities & Antitrust Litigation*, 543 F.2d 1058 (3d Cir. 1976), when the court stated:

. . . the evident intention of Congress, in passing the Trust Indenture Act, 15 U.S.C. § 77aaa et seq., [was] to increase the protection of investors who depend upon the security which an indenture trustee holds in their interest. . .

*Id.*, at 1067. *See also In re Multiponics, Inc.*, 436 F.Supp. 1072, 1075 (E.D.La.1976).

Moreover, we find that the harm allegedly incurred by the debenture holders is the harm Congress sought to avoid, *Rauch v. United Instruments, Inc., supra*, 548 F.2d at 457–458, and that private enforcement suits are the intended means of enforcement. Senate Report at 2. This is to be contrasted with statutes construed to be for the benefit of the public at large, *Cort v. Ash, supra*, 422 U.S. at 82, 95 S.Ct. 2080, and

---

7. 15 U.S.C. § 77v(a) states, in pertinent part:
(a) The district courts of the United States, and the United States courts of any Territory, shall have jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto, *and, concurrent with State and Territorial courts*, of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter. . . .
(Emphasis added.)

8. The *Morris v. Cantor* court apparently did not consider this issue to be one of an implied remedy, because it did not cite or rely on any cases preceding *Court v. Ash*. The *Morris* court simply determined that liability was "created" by the Act for violation of the indenture within the meaning of the jurisdictional grant. While we agree with that court's conclusion and approve of its analysis, this Court will apply the broader *Cort* analysis at the urging of the parties.

with statutes that are primarily criminal in nature. *Kroungold v. Triester*, 407 F.Supp. 414 (E.D.Pa.1975). *See also Cannon v. University of Chicago*, —— U.S. ——, at —— n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

While we recognize that our determination that the debenture holders are members of the class which Congress sought to benefit is not of itself determinative, *Clark v. Gulf Oil, supra*, 570 F.2d at 1146; *Sears, Roebuck & Co. v. Eckard*, 575 F.2d 1197, 1203 n. 16 (7th Cir. 1978), the first of the four factors articulated in *Cort* clearly favors the implication of a federal remedy.

■ The second prong of the *Cort* analysis requires a consideration of the relevant legislative history to discern an intent to grant or deny a federal cause of action. *Cort v. Ash, supra*, 422 U.S. at 82, 95 S.Ct. 2080. We must recognize that the legislative history of a statute which does not expressly grant a private remedy will often be "equally silent or ambiguous on the question." *Cannon v. University of Chicago, supra*, —— U.S. at ——, 99 S.Ct. at 1956. Therefore, while a clear indication of an intention to deny will be determinative, where it is clear that the plaintiffs are members of the class to be benefited, an expression of congressional intent to create a remedy will not be required. *Id.*

First Pennsylvania argues that the Act was designed to minimize all federal involvement in the enforcement process and that the legislative history evidences an intent to deny a federal remedy. The debenture holders argue, in response, that the legislative history evidences an intent to limit federal administrative involvement and that Congress intended to provide a federal *judicial* enforcement procedure.

First Pennsylvania cites the testimony of Commissioner Douglas before a subcommittee of the Committee on Interstate & Foreign Commerce:

Nor does this bill give the Commissioner any power with respect to the enforcement of the provisions in these indentures. Under this bill, if it were the law, the Commission would be concerned only with those provisions which relate to the protection and enforcement of the rights of bondholders. *Once an indenture has been determined by the Commission to conform to the standards of the statute, the work of the Commission will have been completed.* After that date the Commission has no continuing jurisdiction over the corporate trustee; no continuing jurisdiction to take steps in connection with the enforcement of the various covenants in the indenture. *The indenture, after it has been "qualified" under this statute, will be enforceable in the same manner as any other contract is enforceable, in the same manner that indentures presently executed are enforceable.*

House Hearings at 22 (emphasis added). This principle is echoed in the Senate Report, which states:

The Commission's work will be completed when the form of indenture has been qualified under the bill . . . The Commission will have no powers with respect to the enforcement of the provisions of the indenture. *After the indenture has been executed it will be enforceable only by the parties, like any other contract.*

Senate Report at 2 (emphasis added). The Court does not agree that the legislative history evidences an intent to limit all federal involvement in the enforcement process but, rather shows that Congress was concerned with federal *administrative* authority. During the House hearings, immediately preceding the testimony quoted by First Pennsylvania, Commissioner Douglas stated:

Now, this bill does not give the Commission any jurisdiction whatsoever over such matters as the wisdom of the issue or the amount of security to be mortgaged or pledged under the bonds, or the offering price, or the maturity date, or the interest rate, or the sinking-fund provisions. In other words, the Commission is not, under this bill, given power to pass upon the investment merits of particular securities. That is not the theory of it.

House Hearings at 22 (emphasis added). Thus, it is clear that the Commissioner was addressing the issue of minimizing SEC jurisdiction, not judicial jurisdiction. SEC interference was a major concern to Congress and to those associated with the capital market. As the *Morris* court pointed out:

> Banking institutions which frequently acted as trustees registered vigorous opposition to further regulation of business under what they called the "dominion theory." They viewed the Commission as a new agency seeking to expand its regulatory role and increasingly to encroach upon private business, and the registration procedures as so time consuming and costly that necessary financing would cease to be available.

*Morris v. Cantor, supra,* 390 F.Supp. at 821. *See also* House Report at 25–27. We conclude that there is no expression of congressional intent to deny a federal remedy. On the other hand, while it is clear that Congress intended that private suits be the primary enforcement mechanism, there is no clear expression in the legislative history of an intent to grant a federal forum.

■ Third, under *Cort,* we must determine whether a federal remedy is consistent with the overall structure of the Act. We note that a remedy should not be implied if it would frustrate the underlying purpose of the legislative scheme, *Cannon v. University of Chicago, supra,* —— U.S. at ——, 99 S.Ct. 1946, but that " 'it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose.' " *Cort v. Ash, supra,* 422 U.S. at 84, 95 S.Ct. at 2090, *quoting J. I. Case Co. v. Borak,* 377 U.S. at 433, 84 S.Ct. 1555, 12 L.Ed.2d 423. With these principles in mind, we find that a federal cause of action is entirely consistent with the structure of the Act and that such an implication is necessary to effectuate congressional goals. We rely on four factors.

■ First, we rely on the nature of the jurisdictional grant itself. We note that this Court is vested with jurisdiction to enforce any liability "created" by the Act and, in the absence of a statutory defini-

tion, we must rely on the plain meaning of the word. To "create" is defined as "to bring into existence; to make out of nothing and for the first time." Webster's Third New International Dictionary, Unabridged. With this definition in mind, we find that the Act "creates" liability for breach of the terms of an indenture in that those terms exist only because they are required by the Act. We find it manifestly clear that Congress "brought those terms into existence" and do not find it relevant that the liability is "indirectly" created by way of a contract claim. Furthermore, the grant of jurisdiction extends to liability created by "this subchapter" (the Act) and is not limited to the express civil liability provision of the Act. Section 322 also incorporates by reference the grant of concurrent jurisdiction to state and federal courts found in the Securities Act of 1933. A grant of concurrent jurisdiction is consistent with our finding that liability is created by the Act and does not support First Pennsylvania's contention that the debenture holders be relegated to state court.

■ Second, we place great emphasis on the lack of enforcement authority vested in the SEC. We are more willing to find a private remedy in the absence of a federal administrative enforcement provision. *Abrahamson v. Fleschner,* 568 F.2d 862, 872 (2d Cir. 1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). If we were to agree with First Pennsylvania that the debenture holders are relegated to state court, we would create the anomalous situation of having a federally mandated right which is not enforceable in any federal forum, regardless of the amount in controversy or the exhaustion of state remedies.

Third, there is no indication that Congress was concerned with federal/state comity as it relates to the allocation of enforcement authority. Rather, the unique structure of the Act was a result of congressional concern with the allocation of judicial and administrative jurisdiction.

Fourth, we find that the goal of imposing a nationally uniform solution, which establishes uniform and clearly defined obliga-

tions, is best achieved by providing a federal forum. A federal forum would avoid complex choice-of-law problems and would provide a guiding force in the evolution of the law as it relates to trustees' obligations under trust indentures.

■ Fifth, the final inquiry suggested by *Cort* is whether implying a federal remedy is inappropriate because the subject matter involves an area traditionally of concern to the states. *Cannon v. University of Chicago, supra,* —— U.S. at ——, 99 S.Ct. 1946. While we would agree that trust agreements have, in general, been the concern of the states, this is not the end of the analysis. As the court stated in *Polansky v. Trans World Airlines, Inc., supra* :

> Within the terms of the *fourth Cort* test, it would be entirely appropriate to relegate these appellants to whatever remedy has been created by state law. As the premise of this discussion, we recognize that a state remedy for breach of contract, breach of warranty and fraudulent misrepresentation was and, perhaps still is, readily available. *Only where there is some countervailing national interest should the federal courts imply a federal private remedy when an adequate state remedy already exists.*

523 F.2d at 337 (emphasis added). In the case of "qualified" trust indentures, we find that Congress has acted on the need for a uniform national solution; and so we find that there is a countervailing national interest in not relegating debenture holders to state court. Furthermore, while securities issues are, in general, subject to heavy federal regulation, issues under trust indentures are subject to intense and comprehensive federal regulation going to the relationships between the parties. We conclude that, even if the subject matter of the instant dispute was primarily of concern to the states, the Trust Indenture Act changed that.

First Pennsylvania contends that the holdings of *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) and *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), militate against the finding of a federal remedy. While we agree that *Piper* and *Santa Fe Industries* may indicate a trend away from the creation of comprehensive private causes of action, especially in the securities area, each statute must be analyzed in the context of its own legislative facts. We note, therefore, that in *Piper* the Supreme Court refused to create a remedy in favor of an unsuccessful tender offeror under § 14 of the Securities Exchange Act, 15 U.S.C. § 78n(e). However, the Court found that the resolution of all four *Cort* factors militated against the creation of a remedy. *Piper v. Chris-Craft Industries, supra,* 430 U.S. at 37–41, 97 S.Ct. 926. Similarly, in *Sante Fe Industries,* the Court refused to create an implied cause of action under Rule 10b–5, 17 C.F.R. § 240.10b–5, in favor of minority shareholders who were "frozen out" in a "short-form merger." The Court held that the plain meaning of the statute and regulation in question foreclosed the creation of a remedy. *Santa Fe Industries, supra,* 430 U.S. at 477, 97 S.Ct. 1292. Secondly, following the third prong of the *Cort* analysis, the Court held that creating a remedy would not effectuate the primary congressional goal but would interfere with an area traditionally reserved by the states. *Id.,* at 474–480, 97 S.Ct. 1292. On the other hand, after our analysis of the Trust Indenture Act, we find that a federal remedy is entirely consistent with the structure of the Act. Accordingly, we hold that the debenture holders have stated a claim and that this Court is vested with jurisdiction.

## STATUTE OF LIMITATIONS

■ First Pennsylvania argues that, even if this Court has jurisdiction over an implied cause of action in favor of debenture holders against a trustee, the suit by the debenture holders in this case is barred by the applicable statute of limitations. First Pennsylvania urges this Court to apply the one-year period of limitation established by § 323 of the Trust Indenture Act, which states, in pertinent part:

> . . . No action shall be maintained to enforce any liability created under *this*

*section* unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued. 15 U.S.C. § 77www(a) (emphasis added). In response, the debenture holders argue that the one-year period of limitation established by § 323 applies by its very terms to the express liability created by the Trust Indenture Act for false and misleading statements contained in documents filed with the SEC and that, therefore, this Court should apply the analogous period of limitation from state law.

We agree that, by its very terms, § 323(a) only applies to actions enforcing liability for false and misleading statements in documents filed with the SEC. We note that the language relied upon by First Pennsylvania is limited to actions brought to enforce liability "created under *this section*," while the general jurisdictional section relied upon by the debenture holders vests jurisdiction in this Court over actions brought to enforce "any liability created by, *this subchapter*." § 322(b), 15 U.S.C. § 77vvv(b). In light of the plain meaning of the language employed by the draftsmen, we conclude that the one-year period of limitation does not apply to suits against trustees for breach of the indenture. First Pennsylvania refers the Court to *Lewis v. Marine Midland Grace Trust Co.*, 63 F.R.D. 39 (S.D.N.Y.1973), in support of its contention that the one-year period of limitation is applicable. In a decision permitting the plaintiff to amend his complaint to allege causes of action under the Trust Indenture Act, the *Lewis* court outlined the factual allegations and concluded that the one-year limitation had been satisfied. *Id.*, at 51. However, *Lewis* is distinguishable on two grounds. First, the plaintiff in *Lewis* did allege a cause of action under § 323 for false statements in documents filed with the SEC. *Id.*, n. 27. Second, the *Lewis* court simply held that the shortest period of limitation had been satisfied, thus obviating the need to decide which was applicable to what claims.

In the absence of a congressionally mandated period, we must look to the analogous state law. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). We note that the debenture holders' allegations do not sound in fraud but are based on theories of breach of contract and breach of express trust. Consequently, we will apply the six-year period of limitation established in Pennsylvania by 42 Pa.C.S.A. § 5527(2), which states, in pertinent part:

The following actions and proceedings must be commenced within six years:

\*    \*    \*    \*    \*    \*

(2) An action upon a contract, obligation or liability founded upon a bond, note or other instrument in writing, except an action subject to another limitation specified in this subchapter.

The debenture holders in the cases at bar brought suit in September and December of 1978. The indenture was entered into on May 15, 1972, and default did not occur until December, 1976. We conclude that the debenture holders' suit is not time barred.

An appropriate Order will be entered.

## ORDER

AND NOW, TO WIT, this 28th day of June, 1979, IT IS ORDERED as follows:

1. The motion of defendant First Pennsylvania Bank, N.A. ("First Pennsylvania"), to dismiss for lack of jurisdiction over the subject matter, pursuant to Fed.R.Civ.P. 12(b)(1), is hereby *denied*.

2. The motion of defendant First Pennsylvania to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), is hereby *denied*.