680 F.2d 933
 Fed. Sec. L. Rep. P 98,706
PITTSBURGH TERMINAL CORPORATION, Appellant,
v.
The BALTIMORE AND OHIO RAILROAD COMPANY, W. James Price,
Alonzo G. Decker, Jr., James Parker Nolan, Frederick Deane,
Jr., James L. O'Keefe, Gregory S. Devine, Fay A. Le Favre,
Nicholas T. Camicia, Dr. Milton S. Eisenhower, Steven
Muller, John K. Stevenson, Hays T. Watkins, Howard E.
Simpson and Cyrus S. Eaton, all Directors or former
Directors of The Baltimore and Ohio Railroad, The Chesapeake
and Ohio Railroad and/or the Chessie System, The Chesapeake
and Ohio Railway Company and Chessie System, Inc.
Monroe GUTTMANN, Loretta Guttmann, Janet Rees and Evelyn
Bittner, Appellants,
v.
The BALTIMORE AND OHIO RAILROAD COMPANY, W. James Price,
Alonzo G. Decker, Jr., James Parker Nolan, Frederick Deane,
Jr., James L. O'Keefe, Gregory S. Devine, Fay A. Le Fevre,
Nicholas T. Camicia, Dr. Milton S. Eisenhower, Steven
Muller, John K. Stevenson, Hays T. Watkins, Howard E.
Simpson and Cyrus S. Eaton, all Directors or former
Directors of The Baltimore and Ohio Railroad, The Chesapeake
and Ohio Railroad and/or the Chessie System, the Chesapeake
and Ohio Railway Company and Chessie System, Inc.
 Nos. 81-1674, 81-1675.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 16, 1981.
Decided June 3, 1982.
 
 Michael P. Malakoff (argued), Berger, Kapetan, Malakoff & Meyers, P. C., Pittsburgh, Pa., for appellants, Pittsburgh Terminal Corp. and Monroe Guttmann, Loretta Guttmann, Janet Rees and Evelyn Bittner.
 Richard T. Wentley (argued), Anthony J. Basinski, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellees, The Baltimore & O. R. Co., The Chesapeake & O. R. Co. and Chessie System, Inc.
 John J. Repcheck (argued), Gary F. Sharlock, David P. Helwig, Sharlock, Repcheck, Engel & Mahler, Pittsburgh, Pa., for appellees, W. James Price, Alonzo G. Decker, Jr., James Parker Nolan, Frederick Deane, Jr., James L. O'Keefe, Gregory S. Devine, Fay A. Le Fevre, Nicholas T. Camicia, Dr. Milton S. Eisenhower, Steven Muller, John K. Stevenson, Hays T. Watkins, Howard E. Simpson and Cyrus S. Eaton.
 Ralph C. Ferrara, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Gilbert Miller, Atty. Fellow, S. Lee Terry, Jr., Atty., Securities and Exchange Com'n, Washington, D. C., for amicus curiae, Securities and Exchange Commission; Paul Gonson, Sol., Securities and Exchange Com'n, Washington, D. C., of counsel.
 Before ADAMS, GIBBONS and GARTH, Circuit Judges.
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 Pittsburgh Terminal Corporation, Monroe Guttmann, Loretta Guttmann, Evelyn Bittner and Janet Rees (the Bondholders), holders, prior to December 13, 1977, of convertible debentures issued by The Baltimore and Ohio Railroad Company (B & O), appeal from a final judgment dismissing their complaint, which charged that a dividend by the B & O on that date of stock of Mid-Allegheny Corporation (MAC) to B & O stockholders of record on that date violated the federal securities laws and the laws of several states. The defendants are B & O, a Maryland corporation, The Chesapeake & Ohio Railway Company (C & O), a Virginia corporation which on December 13, 1977, owned more than 99% of B & O's common stock, Chessie System, Inc. (Chessie), a Virginia corporation which is a holding company for C & O and its subsidiaries, and fourteen present or former directors of B & O. The convertible debentures owned by the Bondholders are B & O Series A, dated January 1, 1956 and maturing January 1, 2010, paying interest at 4.5%, and convertible at any time before maturity into 10 shares of B & O common stock for each $1000 of face value. The action of which the Bondholders complain is the action of the defendants in fixing December 13, 1977, as both the date of declaration of, and the record date for participation in, the in kind dividend of MAC stock to B & O common stockholders. That action deprived debenture holders of the opportunity to convert before the record date and thereby participate in the dividend. The District Court held that it violated no legally protected rights of the debenture holders.[1] We reverse.I.
 
 
 2
 B & O owns and operates a railroad regulated by the Interstate Commerce Commission (ICC). Prior to the transactions giving rise to this lawsuit, B & O also owned substantial non-rail assets such as real estate, timber and mineral reserves. At one time both its common stock and its debentures were traded on the New York Stock Exchange (NYSE). When C & O acquired 99.63% of B & O's common stock, trading in that security ceased and it was delisted, although 13 individuals still held some shares. The NYSE listing of B & O's convertible debentures continued. No dividends were paid on the B & O common stock after 1961. Thus the holders of convertible debentures had no particular incentive to exercise the conversion privilege unless the no dividend policy were to change.
 
 
 3
 Because the regulations of the ICC prohibited a railroad corporation from engaging in non-rail business, B & O's and C & O's assets not used in rail transportation remained undeveloped. Beginning in 1973 when Chessie was formed, C & O began segregating its non-rail assets in a separate corporation, Chessie Resources, Inc., so that they could be developed free of constraints imposed by the ICC. The Chessie management desired to accomplish the same result with respect to B & O's non-rail assets. To that end, in January of 1977, the Chessie Corporation Restructuring Committee settled on a plan whereby the B & O would transfer those assets to MAC, a wholly owned B & O subsidiary, and then distribute the MAC stock as a dividend to B & O's fourteen common stockholders.
 
 
 4
 If, prior to the dividend in MAC stock, the number of B & O common stockholders were to increase substantially, B & O might have had to file a registration statement for MAC with the Securities and Exchange Commission (SEC). 15 U.S.C. § 77f (1976). There were practical difficulties with the preparation of a registration statement, especially that of placing a value on B & O's non-rail assets. But if notice of the MAC transaction had been given to the convertible debenture holders prior to the record date of the in kind dividend, many of them might have elected to convert. Thus the Restructuring Committee concluded that the MAC transaction should be structured in such a way that the convertible debenture holders would not have such notice until after the record date. This, it was thought, would permit counsel for B & O to obtain from the SEC a no-action letter with respect to registration of the MAC stock.
 
 
 5
 At the time the MAC transaction was under consideration, B & O had outstanding bond obligations under three trust indentures. One of these, a Convertible Income Bond Debenture, contained a provision requiring B & O to pay into a surplus income sinking fund an amount equal to any dividend. A second, the Refunding and General Mortgage Indenture, required that arrearages in the sinking funds had to be made up before a dividend could be paid. It was these provisions which had prevented B & O from paying dividends since 1961. The third Indenture was that governing the convertible debentures held by the Bondholders. In order to facilitate the dividend in MAC stock, B & O called for redemption the Convertible Income Bonds, and discharged the sinking fund arrearages on the Refunding and General Mortgage Indenture by paying the sinking funds approximately $7,000,000. These steps were accomplished by the summer of 1977. The Restructuring Committee then turned to the Indenture for the convertible debentures.
 
 
 6
 The convertible debentures also contained a redemption feature which in 1977 called for payment of a premium of 2.5% of their face amount. (344a). B & O did not elect to redeem. Conversion privilege features of the indenture oblige B & O to reserve sufficient common stock and to adjust for changes in par value. (350a). Conversion rights to the bondholders are protected in the event of merger or sale. (354a). Article V, Section 12 of the Indenture provides:
 
 
 7
 SECTION 12. The Company covenants and agrees that it will not declare and/or pay any dividend on its common stock payable in stock or create any rights to subscribe for stock or securities convertible into stock unless in any such case notice of the taking of a record date for the determination of the stockholders entitled to receive such dividend, distribution or right is given at least ten days prior thereto by at least one publication in an Authorized Newspaper. A copy of each such published notice shall promptly after such publication be filed with the Trustee.
 
 
 8
 (357a). When the convertible debentures were issued in 1956, B & O entered into a listing agreement with the NYSE relating to them, which incorporated by reference B & O's earlier listing agreements. Listing Agreement A-12653 for an earlier bond issue, incorporated by reference in that for the 1956 convertible debenture issue, provides:
 
 
 9
 4. The Corporation will give the Exchange at least ten days' notice in advance of the closing of the transfer books, or of the taking of a record of its stockholders for any purpose.
 
 
 10
 5. The Corporation will publish promptly to the holders of any of its securities listed on the Exchange any action taken by the Corporation with respect to dividends or to the allotment of rights to subscribe or to any rights or benefits pertaining to the ownership of its securities listed on the Exchange; and shall give prompt notice to the Exchange of any such action; and shall afford the holders of its securities listed on the Exchange a proper period within which to record their interests and to exercise their rights; and shall issue all such rights in form approved by the Exchange and will make the same transferable, payable and deliverable in the Borough of Manhattan, in the City of New York.
 
 
 11
 (455a). In addition to the Listing Agreements, the B & O is bound by the Rules of the NYSE. Section A-2 of its Manual, "Timely Disclosure," provides:
 
 
 12
 A corporation whose securities are listed on the New York Stock Exchange, Inc., is expected to release to the public any news or information which might reasonably be expected to materially affect the market for those securities. This is one of the most important and fundamental purposes of the listing agreement which each corporation enters into with the exchange.
 
 
 13
 509 F.Supp. at 1008.
 
 
 14
 In November of 1977, by which time impediments to the payment of dividends on B & O stock in the Convertible Income Bond Debenture and the Refunding and General Mortgage Indenture had been removed, plaintiff Monroe Guttmann wrote to the Secretary of B & O:
 
 
 15
 As one of the very few public owners of B & O common stock, we are concerned that we may not be made aware of any dividend the directors declare on the common stock in sufficient time to convert any of our convertible debentures.
 
 
 16
 Although it may not be customary to do so in view of the fact that declaration of a dividend may not be widely publicized, if publicized at all, we ask that you notify us promptly of any such dividend declaration so that we will have an opportunity to convert debentures in time to receive such dividend if we choose to do so.
 
 
 17
 Will you please let me know what provisions there are in the by-laws of the company that govern the time which must elapse between the declaration of a dividend, the record date and the payable date.
 
 
 18
 (311a). To this pointed inquiry the Secretary, on November 17, 1977, replied:
 
 
 19
 Thank you for your letter of November 11. We appreciate your concern as a holder of B&O Convertible Debentures as to whether B&O would fail to disclose the declaration of a dividend in its common stock.
 
 
 20
 You may be assured that if B&O should have any information to announce regarding dividend action on B&O stock, such information will be disseminated promptly to the public at large. Because we cannot prefer you over the public at large advance advice cannot be sent to you, but I will make sure that you get a copy of such press release. We are not in a position to help you with respect to your decision whether or not to convert.
 
 
 21
 There is no by-law provision relating to the timing of the declaration, record, and payment dates.
 
 
 22
 (312a). By the time of Guttmann's inquiry and the Secretary's reply, the Restructuring Committee's plan to structure the MAC transaction so as to avoid timely notice to the convertible bondholders was well advanced.
 
 
 23
 Four in-house attorneys employed by B & O or C & O, one of whom was Chairman of the Restructuring Committee, examined the 1956 indenture and the New York Stock Exchange listing agreements. They concluded that the indenture required notice of stock dividends in B & O stock, but not of distributions of stock of subsidiaries. They concluded that that provision in the New York Stock Exchange listing agreement was inapplicable because it requires 10 days notice only with regard to dividends declared on listed stocks, and B & O common stock had been delisted. They concluded that under Maryland law, absent any action by the directors, the payment date of a dividend could be the same as the declaration date. The Restructuring Committee determined, therefore, to avoid giving notice to the convertible debenture holders. Their purpose in doing so was to prevent conversions which might require filing a registration statement for MAC stock.
 
 
 24
 The General Counsel of B & O retained the law firm of Hunton & Williams of Richmond, Virginia, to submit to the SEC a request for a no-action letter with respect to B & O's distribution of MAC shares. Prior to the time Hunton & Williams wrote to the SEC, the B & O Board of Directors met and adopted two resolutions. In the first resolution the Board authorized B & O's officers to convey a list of non-rail assets to MAC as a contribution to its capital. (409a). In the second, the Board resolved to distribute the MAC stock as a dividend to B & O shareholders. That resolution provides in part:
 
 
 25
 RESOLVED, that the dividend on the Common Stock as specified in the next preceding resolution be payable on this date to shareholders of record at the close of business on this date; provided, however, that such payment shall be made by depositing such stock of Mid Allegheny Corporation with Mercantile Safe Deposit and Trust Company of Baltimore, Maryland, in trust, to be delivered to such shareholders of this Company on the earlier of the following dates, viz.: two days following the receipt of a letter from the Securities and Exchange Commission that it will take no action if the stock of Mid Allegheny Corporation is distributed to this Company's shareholders without registration under the provisions of the Securities Act of 1933; or two days following the date of an effective registration statement with respect to the stock of Mid Allegheny Corporation.
 
 
 26
 (417a). Thus actual delivery of the MAC stock certificates to shareholders was made contingent upon the obtaining of a no-action letter or the filing of a registration statement. It seems clear from the wording of the resolution that B & O intended to file a registration statement if it could not obtain a no-action letter, for the dividend declaration is unconditional.
 
 
 27
 Three days after B & O's dividend action, Hunton & Williams sent a request for a no-action letter to the SEC. (908a). That firm's December 16 letter to the Commission requested a no-action letter only with respect to a distribution of MAC stock to C & O and 13 individual B & O stockholders. It made no mention of the rights of convertible debenture holders. In its request Hunton & Williams opined that the distribution of MAC shares by B & O was not a sale within the meaning of Section 2(3) of the Securities Act of 1933, 15 U.S.C. § 77b(3). Alternatively the firm suggested that if a sale were involved, the transaction was exempt under 17 C.F.R. § 230.240 (1981). That SEC rule, issued pursuant to Section 3(b), 15 U.S.C. § 77c(b), exempts from registration certain securities of an issuer to fewer than 100 persons, provided that restrictions on transferability are legended on the certificates. The no-action letter was not immediately forthcoming from the SEC, and on January 18, 1978, Hunton & Williams withdrew its reliance on 17 C.F.R. § 230.240. (914a). Another written request was filed on June 29, 1979, relying solely on the contention that the dividend in MAC stock was not a sale. (915a). In September of 1979, long after the commencement of this lawsuit, the SEC issued a no-action letter "provided that MAC shares distributed to persons other than C & O are restricted as to transfer." The SEC letter noted that the District Court had by then entered an order that the defendants must hold at least 940 shares of MAC for tender to the convertible debenture holders if they prevailed. (919a).
 
 II.
 
 28
 The first of these consolidated actions was commenced by Pittsburgh Terminal Corporation on December 28, 1977, and the others soon followed. On March 7, 1978 the District Court issued a preliminary injunction restraining the defendants from proceeding with the dividend in MAC stock.[2] Defendants appealed from that order, and when they agreed to hold sufficient shares of B & O and MAC stock to satisfy the claims of the convertible debenture holders, should they prevail, this court reversed that injunction.[3] The Bondholders sought class action certification, which was denied as a result of an agreement between B & O and the Trustee under the 1956 indenture that should plaintiffs prevail, all debenture holders similarly situated will be accorded the treatment required by any judgment in plaintiffs' favor.[4] Motions for summary judgment in favor of the defendants were denied.[5] Thus the consolidated cases went to trial on amended complaints challenging the December 13, 1977 actions of the B & O Board of Directors. The complaints alleged that those actions violated Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), the contractual rights of the convertible debenture holders under the provisions of the Indenture, their rights as third party beneficiaries of the NYSE listing agreements, the obligations of B & O under the rules of the NYSE, and the fiduciary duties of directors and of majority stockholders under Maryland law. The District Court, over defendants' objection, held that the convertible debenture holders had standing to make these claims, but rejected each of them. The court held that there was an insufficient showing of scienter for a Section 10(b) violation; that Section 6 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78f, does not permit private enforcement of the NYSE rules; that the listing agreements confer no rights on any party other than the NYSE; that the indenture does not require notice of a dividend in stock of a subsidiary; and that the December 13, 1977 MAC transactions were entirely legal under Maryland law.[6] Without ruling definitively, the court also expressed doubts about what relief would be proper assuming liability had been established.
 
 III.
 A. Purchase or Sale
 
 29
 Section 10(b) prohibits the use of manipulative or deceptive devices or contrivances "in connection with the purchase or sale of any security." The District Court held that a contract to obtain common stock in exchange for the surrender of a convertible debenture is a contract for purchase or sale of a security, and thus that the debenture holders could sue. Defendants challenge that holding. They place principal reliance upon Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). That case approved the earlier holding in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), that only purchasers and sellers of securities could bring a private damage action under Section 10(b). While Blue Chip Stamps v. Manor Drug Stores holds that mere offerees may not sue under Section 10(b), the opinion of the Court carefully distinguishes the case of persons holding actual contractual rights to buy and sell securities. 421 U.S. at 749-50, 95 S.Ct. at 1931-1932. There is no indication that the Court intended to cast any doubt on the settled rule that a contract to buy or sell securities is a purchase or sale within the meaning of Section 10(b), and that a party to such a contract has standing to sue for damages.[7] The indication is quite the contrary, for the Court observed:
 
 
 30
 Unlike respondent, which had no contractual right or duty to purchase Blue Chip's securities, the holders of puts, calls, options and other contractual rights or duties to purchase or sell securities have been recognized as "purchasers" or "sellers" of securities for purposes of Rule 10b-5, not because of a judicial conclusion that they were similarly situated to "purchasers" or "sellers," but because the definitional provisions of the 1934 Act themselves grant them such status.
 
 
 31
 421 U.S. at 751, 95 S.Ct. at 1932.
 
 
 32
 Since we hold that the conversion option in a convertible debenture qualifies as a contract for the purchase or sale of a security, we need not reach the plaintiffs' alternative contention that the MAC dividend is a purchase or sale which would satisfy Section 10(b). See International Controls Corp. v. Vesco, 490 F.2d 1334, 1345 (2d Cir.), cert. denied, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974) (a dividend in kind of shares of a spun off corporation qualifies as a sale of securities).
 
 B. Duty to Speak
 
 33
 The Bondholders contend that by fixing the dividend date and the record date of the MAC dividend so as to prevent them from exercising their conversion option in time to participate in that dividend, the defendants violated Section 10(b) and SEC Rule 10b-5(a) and (c), 17 C.F.R. 240.10b-5(a) and (c) (1981). It is undisputed that the defendants made a knowing decision to time the December 13, 1977 transactions so as to prevent the Bondholders from obtaining timely notice of them. Defendants contend that the decision was lawful because they made no affirmative misrepresentation and because they were under no affirmative obligation to speak.
 
 
 34
 In Chiarella v. United States, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980), the Court observed that "one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so." It held that a printer, who had no fiduciary obligation to a corporation or its shareholders, and who did not receive information as a result of the breach of any fiduciary relationship, could not be liable for a criminal violation of Section 10(b). "He was not (the sellers') agent, he was not a fiduciary, he was not a person in whom the sellers had placed their trust and confidence." 445 U.S. at 232, 100 S.Ct. at 1116. The defendants contend that Chiarella requires an affirmance, because like the printer who happened upon material market information, none of them had a duty to speak.
 
 
 35
 To put that contention in context, we note that the Bondholders were on December 13, 1977, holders of options to acquire B & O equity securities, while C & O was a majority holder of those securities having voting control of B & O. The convertible debentures were listed on the NYSE, and the listing agreement applicable to them imposed on B & O the affirmative duties (a) to give ten days notice to the Exchange of a record date for a dividend, and (b) to "afford the holders of its securities listed on the Exchange a proper period within which to record their interests and exercise their rights." These requirements of the listing agreement parallel those in SEC Rule 10b-17, which provides:
 
 
 36
 (a) It shall constitute a "manipulative or deceptive device or contrivance" as used in section 10(b) of the Act for any issuer of a class of securities ... to fail to give notice in accordance with paragraph (b) of this section of the following actions relating to such class of securities:
 
 
 37
 (1) A dividend or other distribution in cash or in kind, except an ordinary interest payment on a debt security, but including a dividend or distribution of any security of the same or another issuer; ...
 
 
 38
 17 C.F.R. § 240.10b-17 (1981). B & O is the issuer of the convertible debentures, the MAC distribution is a dividend of a security, and that dividend related to the convertible debentures since it was material to a decision about exercising the conversion option. The convertible debentures were not simple debt securities, for which the information about dividends ordinarily would not be material.
 
 
 39
 Whatever may be the fiduciary duty of majority stockholders and corporate directors under Maryland law to general unsecured creditors, we are here dealing with securities having an equity option feature. Maryland follows the settled rule that a control stockholder owes a fiduciary obligation not to exercise that control to the disadvantage of minority equity participants. Cooperative Milk Service v. Hepner, 198 Md. 104, 81 A.2d 219, 224 (1951). Similarly, Maryland directors must act as fiduciaries to all equity participants. Coffman v. Maryland Pub. Co., 167 Md. 275, 173 A. 248, 254 (1934); Lawson v. Baltimore Paint and Chemical Corp., 347 F.Supp. 967, 975 (D.Md.1972). Although no Maryland case has been called to our attention presenting the precise issue of fiduciary obligations to holders of securities containing stock options, we would be very much surprised if Maryland or any other state would today hold that no such obligations were owed by an issuer of such securities and its directors. Moreover the scope of the obligation of the fiduciary depends upon the nature of the interest of the beneficiary. If the beneficiary of a fiduciary duty needs information in order intelligently to protect that interest, the withholding of it, especially when withholding it confers advantage upon others (in this case C & O and Chessie) is an obvious breach of duty.
 
 
 40
 The 1956 Indenture under which B & O borrowed the sums evidenced by the convertible debentures was made in New York and the loan transaction completed there. B & O's obligation, therefore, is a New York contract. The law of that state is "that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract...." Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933). See Van Gemert v. Boeing Co., 553 F.2d 812, 815 (2d Cir. 1977); Restatement (Second) of Contracts § 205 (1981). Defendants in this case took steps to prevent the Bondholders from receiving information which they needed in order to receive the fruits of their conversion option should they choose to exercise it. As a matter of New York contract law, B & O had a duty to speak.
 
 
 41
 In the present context we do not look to the listing agreement. Rule 10b-17, the Maryland law of fiduciary obligations, and the New York law of contracts, as sources of independent causes of action, though they well may be. Rather we look to them as sources of a duty to speak, breach of which under Section 10(b) and Rule 10b-5(a) and (c) gives rise to a cause of action for fraud. Those four independent sources of duty to speak in the circumstances of this case amply serve, separately or collectively, to distinguish it from Chiarella v. United States, supra. We need not consider other sources of such duty relied on by the Bondholders.
 
 C. Scienter
 
 42
 The defendants urge that even if they were under a duty to speak, their decision not to do so in this instance did not involve the scienter required by the Supreme Court's interpretation of Section 10(b). The District Court, relying on Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), accepted this argument. It found that there was a legitimate business purpose in removing the non-rail assets from ownership and control of B & O.[8] That finding is not relevant, however, for what is complained of is not the formation of MAC or the decision to spin it off, but the decision to do both while concealing those steps from the Bondholders until it was too late for them to participate by exercising conversion rights if they chose to do so.
 
 
 43
 In this record, and indeed in the court's findings of fact, it is plain that the Restructuring Committee and B & O's Directors knew (1) that the information about the dividend in MAC shares, or information about any other dividend action after a lapse of sixteen years, was material to the Bondholders; (2) that cutting off conversion options would inure to the benefit of C & O, the majority stockholder; and (3) that the decision not to announce the dividend was intended to prevent timely exercise of the conversion privilege. The decision to time the MAC transaction so as to prevent notice to the Bondholders until too late was both knowing and intentional. No more is required by the governing cases. Aaron v. Securities and Exchange Commission, 446 U.S. 680, 690, 100 S.Ct. 1945, 1952, 64 L.Ed.2d 611 (1980); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); Cramer v. General Telephone & Electronics Corp., 582 F.2d 259, 273 (3d Cir. 1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979). Cf. McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979).
 
 
 44
 The defendants insist that despite their intention to prevent timely exercise of conversion rights prior to the MAC dividend, they lacked the necessary scienter as a matter of law for two reasons. First, they contend, they had a valid business purpose in cutting off conversion rights in that they desired to avoid having to file a registration statement for MAC stock. This is a business reason, certainly, but not a valid one. Of course, the removal of non-rail assets from the reach of the conversion privilege, and the avoidance of the expense of preparing and filing a registration statement, was good business for some of the interested parties. Clearly, however, it was bad business for the Bondholders. Any manipulative act or practice can be justified by focusing only on the business purpose of the side of the transaction which benefited from it.
 
 
 45
 Defendants' second contention is that their reliance on the advice of counsel employed by B & O and C & O is a complete defense. In this case it is not. A violation of Section 10(b) does not require a specific intention to break the law. It requires only knowing or intentional actions which, objectively examined, amount to a violation. See Securities and Exchange Commission v. Falstaff Brewing Corp., 629 F.2d 62, 77 (D.C.Cir.), cert. denied sub nom. Kalmanovitz v. Securities and Exchange Commission, 449 U.S. 1012, 101 S.Ct. 569, 66 L.Ed.2d 471 (1980); Arthur Lipper Corp. v. Securities and Exchange Commission, 547 F.2d 171, 181 (2d Cir. 1976), cert. denied, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). Advice of counsel may bear upon scienter in some cases: where, for example, directors rely upon counsel to conduct a factual investigation of the truth of information to be released; or where counsel mistakenly but in good faith represent that some information is either immaterial or clear. In such instances the defendants may not have an appreciation of the consequences of their conduct. But where, as here, they know the materiality of the concealed information and intend the consequences of concealment, advice of counsel that they will not incur liability cannot be recognized as a defense. The court, not counsel, must make that ultimate legal determination.
 
 
 46
 On the facts as found, therefore, the District Court erred in ruling that the defendants lacked the scienter required for a Section 10(b) violation.
 
 
 47
 We hold, therefore, that on the facts found by the District Court, the December 13, 1977 transaction, designed to deprive the Bondholders of timely notice in order to exercise their conversion option if they should so desire was a manipulative or deceptive device or contrivance in violation of Section 10(b).[9]
 
 IV.
 
 48
 Our holding in Part III requires a reversal. The Bondholders also contend that they proved a breach of the Indenture, a claim as a third party beneficiary for breach of the listing agreement and breaches of fiduciary duty under Maryland law. In the District Court they pleaded, as well, a cause of action under Section 6 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78f, for violation of the NYSE rules. They do not suggest, however, that the relief available under Section 10(b) is less extensive than would be available under these alternative legal theories. Since it appears that no different remedies would be available were we to decide in the Bondholders' favor on those alternative legal theories, there is no reason to address them.
 
 V.
 
 49
 As a separate ground for affirmance, the defendants urge that the Bondholders failed to prove damages and have not to date exercised their conversion option. Obviously the Bondholders could not be expected to exercise a conversion option until they knew whether or not they were entitled to participate in the distribution of MAC stock. As to the speculative nature of the award of money damages, the difficulty arises out of B & O's conscious choice to avoid making an evaluation of the B & O assets transferred to MAC as a contribution to capital. The District Court speculated that devising an appropriate remedy might be difficult. So it may be, but the Bondholders were the victims of a Section 10(b) violation, and they are entitled to be heard about what the remedy should be. Since the District Court did not rule on the matter of relief, nothing is before us on that aspect of the case which we can intelligently review. A remand is required so that the trial court can fashion an appropriate remedy for the violation we have found.
 
 VI.
 
 50
 Except for the judgment in favor of Milton D. Eisenhower, the judgment in favor of the defendants will be reversed, and the case remanded for a determination of appropriate relief.
 
 
 51
 GARTH, Circuit Judge, concurring in part and concurring in the judgment.
 
 
 52
 I agree that the judgment of the district court must be reversed. However, in concluding that the defendants violated Rule 10b-5, 17 C.F.R. § 240.10b-5 (1981), I would predicate their duty to disclose the Mid-Allegheny Corporation (MAC) dividend solely on the provisions of Rule 10b-17, 17 C.F.R. § 240.10b-17 (1981), rather than on the complex of theories set forth in Part III-B of Judge Gibbons' opinion. I thus would not reach the question whether the defendants had a duty to disclose under the New York Stock Exchange (NYSE) listing agreement, the Maryland law of fiduciary obligations, or the New York law of contracts.
 
 I.
 
 53
 Rule 10b-17 provides that the failure of an issuer to give ten days' prior notice of the declaration of a dividend relating to a publicly traded security constitutes a "manipulative or deceptive device or contrivance" within the prohibitions of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976).[1] Here, it is undisputed that while the common stock of the Baltimore & Ohio Railroad Company was not publicly traded or listed on any national securities exchange (99.63 percent of the common stock was owned by the Chesapeake & Ohio Railway Company), the convertible debentures were publicly traded and were listed on the NYSE. Thus, the B & O convertible debentures are a publicly traded class of securities within the meaning of Rule 10b-17.[2] It is also undisputed that the B & O failed to give ten days' notice of its action in declaring the MAC stock dividend to the National Association of Securities Dealers (NASD), or to the NYSE in accordance with the procedures set forth in the B & O's listing agreement with that Exchange.[3] Thus, the only remaining question to be answered is whether the declaration of the MAC dividend was an action "relating to" the publicly traded convertible debentures within the meaning of Rule 10b-17. If Rule 10b-17 applies, a duty of disclosure arises, the breach of which provides the predicate for a violation of Rule 10b-5. See generally Chiarella v. United States, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980).[4]
 
 II.
 
 54
 The defendants argue that the notice requirements of Rule 10b-17 apply only to dividends declared on publicly listed stock. Because the B & O's common stock was not publicly listed, the defendants argue, no notice was therefore mandated.
 
 
 55
 In my opinion, this argument contemplates too restrictive a reading of Rule 10b-17. The Rule was meant to protect the ability of investors to exercise their investment rights to the fullest. It does so by operating to ensure that opportunities to exploit benefits associated with security ownership will not be lost by the withholding of material information. As the SEC explained when it proposed Rule 10b-17, in the absence of disclosure of imminent dividend declarations, "purchasers and their brokers may have entered into and settled securities transactions without knowledge of the accrual of such rights and were thus unable to take necessary steps to protect their interests." Securities Exchange Act Rel. No. 9076, 36 Fed.Reg. 3430 (Feb. 17, 1971).
 
 
 56
 While it is true that the Rule makes no specific reference to convertible debentures as such, it without question includes such instruments within its classification of "securities publicly traded" and proscribes the failure to give notice of dividends "relating to such class of securities." See note 2 supra. I agree with the SEC that
 
 
 57
 (f)or purposes of determining what information is material to security holders, there is a significant difference between the holders of simple debt securities and the holders of debt securities convertible into stock. The latter own contracts to purchase the stock on specified terms and at a specified price and, as a result, have as great an interest in material facts concerning that stock as do the stockholders.
 
 
 58
 SEC Amicus Brief at 19 n.17.
 
 
 59
 It is obvious that a stock dividend declared on common stock comes within the terms of Rule 10b-17. It would be anomalous if a stock dividend which becomes payable simply by the exercise of converting a debenture were not considered as "relating to such class of (convertible debenture) securities." It seems to me that in the context of Rule 10b-17, a dividend "relates to" a security if the declaration of that dividend makes the security significantly more or less valuable, whether by directly increasing or decreasing the value of the security or by enabling the holder of the security to take steps which would either augment the security's worth or prevent the diminution of its value.
 
 
 60
 Here, the convertible debentureholders claim that the value of the non-rail assets of the B & O which are represented by the MAC dividend roughly approximates $250 million. Prior to the declaration of the MAC dividend, the debentures included the right to convert to B & O common stock which represented both rail and non-rail assets; after the dividend declaration, the debentures were convertible into B & O common stock which no longer represented the non-rail assets and only represented the rail assets. Tested by the definition set out above, it is evident to me that the declaration of such a dividend in which the convertible debentureholders could share in both categories of assets by exercising their conversion option, is an action which clearly "relates to" this class of securities.
 
 
 61
 Accordingly, I agree with Judge Gibbons, who has reached a similar conclusion in his opinion where he has indicated that the MAC dividend "related to the convertible debentures since it was material to a decision about exercising the (debentures') conversion option." Op. of Gibbons, J., at 941. Under the analysis I have suggested, the defendants had a duty under Rule 10b-17 to give advance notice to the NASD or the NYSE (and through them to the convertible debentureholders) of the declaration of the MAC dividend. The conceded failure of the defendants to give such notice rendered them liable in damages under Rule 10b-5. That being the case, there is no need to consider whether any other theory is viable which would impose a duty upon the defendants to give notice to the holders of the convertible debentures.
 
 
 62
 Accordingly, I join Judge Gibbons' opinion except for Part III-B, and concur in the reversal of the judgment below.
 
 
 63
 ADAMS, Circuit Judge, dissenting.
 
 
 64
 The Supreme Court recently has made clear that liability for nondisclosure of material information under the federal securities laws cannot be imposed absent a duty to speak. Chiarella v. United States, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980). Aware of this precept, Judge Gibbons has pointed to no fewer than four possible sources from which to derive a duty, on the part of The Baltimore and Ohio Railroad, to notify its convertible debenture holders prior to the declaration of the MAC dividend. Judge Garth, concurring, has limited the duty analysis solely to the provisions of Rule 10b-17; the holding of the Court, therefore, rests on that narrow ground. Unlike my two colleagues, I conclude that B&O was under no legal obligation-pursuant to Rule 10b-17 or otherwise-to provide plaintiffs with advance notice of the MAC dividend. I therefore respectfully dissent.
 
 I.
 
 65
 Convertible debentures frequently are characterized as "hybrids," embodying the attributes of both debt and equity securities. See, e.g., Broad v. Rockwell International Corp., 642 F.2d 929, 940 (5th Cir.) (en banc), cert. denied, --- U.S. ----, 102 S.Ct. 506, 72 L.Ed.2d 380 (1981); American Bar Foundation, Commentaries on Indentures 523 (1971); Note, Hoff and Harff: Does the Convertible Debenture Holder Have Standing to Maintain a Shareholder Derivative Action?, 26 Syracuse L.Rev. 730, 751 (1975). As such, they have proven to be an attractive and effective means of corporate financing. Like most debt securities, convertible debentures provide a fixed rate of return and assure the investor priority, over common shareholders, in claims on the issuer's assets. Should the market price of the common stock rise, however, the debentureholder may exercise an option to convert the debt security into shares of common stock. "Thus there is the opportunity to benefit from a rise in stock prices from the comparative safety of a debt ... position." Katzin, Financial and Legal Problems in the Use of Convertible Securities, 24 Bus.Law. 359, 361 (1969).
 
 
 66
 From the corporation's standpoint, the issuance of convertible debentures can be similarly advantageous. Primarily, the convertible securities provide a way to raise new capital indirectly-by permitting management " 'to raise funds today at tomorrow's higher common stock prices.' " Fleischer & Cary, The Taxation of Convertible Bonds and Stock, 74 Harv.L.Rev. 473, 474 (1961) (quoting Pilcher, Raising Capital with Convertible Securities 61, 138 (1955)). In addition,
 
 
 67
 the new funds will be contributing to income by the time the debentures are converted. In the interim, while the company is putting the new money effectively to work, the charge takes the form of interest-deductible for tax purposes-rather than a reduction in income per share. Thus the dilution of earnings which traditionally accompanies an equity issue is deferred until the firm is making more money.
 
 
 68
 Id. (footnote omitted). Finally, because the conversion feature is so attractive to investors, the issuer can often offer the debentures at an interest rate lower than that required on other debt securities. Katzin, supra, at 362. But see Klein, The Convertible Bond: A Peculiar Package, 123 U.Pa.L.Rev. 547, 558-59 (1975) (referring to this rationale as "flimflam").
 
 
 69
 Whatever financial advantages attach to the issuance or purchase of convertible debentures, the legal status of these hybrid securities remains inherently complex. As debt securities, the debentures impose a specific set of obligations on the corporation-namely, the regular payment of interest and the repayment of principal upon maturity. As equity securities, in contrast, the debentures may require a broader range of duties from the issuer. The difficulty lies not in the characterization of the debenture as either debt or equity-for it is both-but in determining, in each case, the extent to which the investor is owed rights and remedies beyond those commonly accorded debt holders.[1]
 
 
 70
 The traditional view is that the convertible debenture holder is a mere creditor until conversion, whose relationship with the issuing corporation is governed by contract and statute. In an early Massachusetts decision, for example, the court rejected a convertible note holder's claim that he had an equitable interest in newly-issued shares of stock. Pratt v. American Bell Telephone Co., 141 Mass. 225, 5 N.E. 307 (1886). The plaintiff was "in no sense a stockholder," declared the court; his "rights and interest as a stockholder of the corporation were postponed to the time when he made his option and demanded his stock. Pending this time, the contract gave him the right to payment of the coupons attached to the notes, and nothing more." 5 N.E. at 311.
 
 
 71
 Several years later, Justice Holmes expanded upon this principle, holding for the Supreme Court of Massachusetts that the debenture holder had no right, apart from contract, to object to corporate actions that dilute or destroy the value of the conversion option:
 
 
 72
 (the option) imposes no restriction upon the obligor in regard to the issue of new stock, although the issue may be upon such terms as to diminish the value of the right. It leaves the management of the company in accordance with its other interests unhampered. It is simply an option to take stock as it may turn out to be when the time for choice arrives. The bondholder does not become a stockholder, by his contract, in equity any more than at law....
 
 
 73
 ... (T)he contract does not prevent the corporation from consolidating with another in such a way as to make performance impossible, any more than it prevents the issue of new stock in such a way as to make performance valueless.
 
 
 74
 Parkinson v. West End St. Ry. Co., 173 Mass. 446, 53 N.E. 891, 892 (1899). See also Gay v. Burgess Mills, 30 R.I. 231, 74 A. 714 (1909). And in Lisman v. Milwaukee, L. S. & W. Ry. Co., 161 F. 472 (E.D.Wis.1908), aff'd. 170 F. 1020 (7th Cir. 1909), the court held that convertible debenture holders could not complain when the railroad company in which they had invested merged with another railroad. The fact that the parties "were bound to" have anticipated such a consolidation when they entered into the option contract was dispositive.
 
 
 75
 The rights and remedies of convertible debenture holders have expanded since the turn of the century. Most notably, the Securities Exchange Act of 1934 accords convertible debenture holders the federal statutory rights of "equity security holders,"[2] able, for example, to employ section 10(b) of the Act to protect against fraud or manipulative devices. 15 U.S.C. § 78j. Congress's explicit recognition of convertibles as equity, as well as debt, securities has had significant consequences. In Kusner v. First Pennsylvania Corp., 531 F.2d 1234 (3d Cir. 1976), for instance, this Court held that a convertible debenture holder, who alleged that he had purchased the securities in reliance on a false and misleading prospectus, had standing to sue under section 10(b). Kusner depicts the precise sort of situation in which a section 10(b) remedy is appropriate for debenture holders in their role as equity investors. As the Court explained, in such a case, the debenture holder's need for accurate information about the corporation was as pressing as any shareholder's:
 
 
 76
 If during the conversion period the value of the common stock (a function of its market price and dividend position) greatly exceeds the value of the fixed payment and interest obligation, a holder probably will exercise the conversion privilege. The possibility that the value of common stock will increase to a point where it exceeds the value of the bond is the sales feature with which the issuer obtained a lower-than-market interest rate on the bond. Thus ... a misrepresentation in the prospectus that would be material to a stock purchaser would be material to a convertible bond purchaser. The convertible bond purchaser may well have been defrauded of the interest differential.
 
 
 77
 531 F.2d at 1238 (footnote omitted).
 
 
 78
 The mere availability of a securities act remedy for fraud, however, does not answer the question whether the common law rule of Parkinson remains the applicable standard by which to judge whether or not a corporation has, indeed, acted fraudulently. That question was addressed and analyzed perceptively in a recent en banc Fifth Circuit decision, Broad v. Rockwell International Corp., 642 F.2d 929 (5th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 506, 72 L.Ed.2d 380 (1981). There, the plaintiff debenture holders complained that when the company in which they had invested was acquired by another entity in a cash merger, they lost their right to convert into common stock. The Court concluded that the plaintiffs had "received ... all to which they were contractually entitled under the Indenture" and that, as a result, no violation of section 10(b) could have occurred:
 
 
 79
 There is no doubt but that there was concerted, intentional conduct by the defendants to bring about (the) result (about which plaintiffs complain). But as a matter of law, there was no violation of section 10(b) or Rule 10b-5 because there was no fraud. "Section 10(b) is aptly described as a catch-all provision, but what it catches must be fraud." Chiarella v. United States, 445 U.S. 222, 234-35 (100 S.Ct. 1108, 1117-1118, 63 L.Ed.2d 348), ... (1980) (criminal prosecution under section 10(b) and Rule 10b-5). It is elementary that section 10(b) and Rule 10b-5 reach only conduct involving manipulation or deception. E.g., Santa Fe Industries, Inc. v. Green, 430 U.S. 462 (97 S.Ct. 1292, 51 L.Ed.2d 480), ... (1977); Ernst & Ernst v. Hochfelder, 425 U.S. 185 (96 S.Ct. 1375, 47 L.Ed.2d 668), ... (1976). The defendants' conduct involved neither; they merely carried out their contractual obligations. As a conceptual matter, they could not have fraudulently schemed to deprive the holders of Debentures of a right that those holders did not in fact have.
 
 
 80
 642 F.2d at 963.
 
 
 81
 Virtually every modern commentator appears to agree with the Broad court that convertible debenture holders have no cause to complain about legal corporate conduct that adversely affects the value of the conversion option unless such conduct has been explicitly proscribed or otherwise addressed in the debenture indenture.[3] As explained by the American Bar Foundation:Inasmuch as ownership of a convertible debenture does not give the holder the rights of a shareholder, the holder of a convertible debenture would have almost no protection against acts by the Company which would adversely affect the value of the common stock issuable on conversion, such as split-up of shares, stock dividends, distribution of assets, issuance or sale of other convertible securities, issuance of options, issuance or sale of common stock at prices below the current conversion or market price, merger, sale of assets or dissolution and liquidation of the Company. Events of this type are customarily described as "diluting" the value of the conversion privilege, and if protection is desired against such dilution, appropriate provisions must be included in the indenture.
 
 
 82
 Commentaries, supra, at 527 (emphasis added) (footnote omitted). See also Broad v. Rockwell International Corp., supra at 943; Kessler v. General Cable Corp., 92 Cal.App.3d 531, 155 Cal.Rptr. 94, 99-100 (1979); 6A W. Fletcher Cyclopedia of the Law of Private Corporations §§ 2694-2694.1 (perm. ed. 1981). Such so-called "anti-dilution clauses" are thus among the most important of the various contract provisions that can be negotiated between the issuing corporation and the debenture holders or their representatives.[4] Commonly, they require the corporation to give the debenture holder advance notice of specific acts that may erode or destroy the conversion option, so that the investor can convert, if he so chooses, prior to the act in question. Alternatively, the anti-dilution clause can provide for the adjustment of the conversion price to reflect the change in value. See Irvine, Some Comments Regarding "Anti-Dilution" Provisions Applicable to Convertible Securities, 13 Bus.Law. 729 (1958). Less frequently, the anti-dilution provision is drafted to prohibit the corporation from taking certain actions that may cause diminution in the value of the conversion option. See Commentaries, supra, at 527-28.
 
 
 83
 The conduct at issue in the present case-namely, the transfer of B&O's non-rail assets to MAC and the distribution of the MAC stock to B&O's common shareholders-is clearly of the sort that could have been addressed by the inclusion of an appropriate anti-dilution provision within the indenture. Such a provision could have taken any number of forms. In its Commentaries on the Model Debenture Indenture provisions, for instance, the American Bar Foundation noted that "(w)hen dividends are declared and paid other than in shares of common stock or as normal cash dividends," the debenture holder's conversion rights can be protected against dilution "by providing for a reduction of the conversion price to reflect the diminution of the corporate assets resulting from such dividends." Commentaries, supra, at 529. Moreover, the Bar Foundation continued, "(i)t is sometimes provided that, upon exercise of his conversion rights, the debentureholder shall receive, in addition to the shares to which he is entitled, the amount of assets (or a sum equal to the value thereof) which would have been distributed to him if he had exercised his right to convert immediately prior to the record date for such distribution." Id.[5] And at least one commentator has suggested that it is advisable to insert in the indenture a provision giving holders of convertible securities adequate notice in the event that "the Company shall propose ... to pay any dividend payable in stock of any class to the holders of its Common Stock or to make any other distribution to the holders of its Common Stock (other than a cash dividend payable out of earnings or earned surplus legally available for the payment of dividends ... )." Kaplan, supra note 4, at 13 n.24 (emphasis added). Such a notice provision would clearly encompass the kind of arrangement against which Pittsburgh Terminal has complained in the case at bar.
 
 
 84
 Significantly, although the commentators have been careful to consider the situation in which a corporation distributes its assets in forms other than ordinary cash or stock dividends, the indenture at issue here contains no such provision. While the indenture does address a variety of potentially diluting acts-including a change in the par value of the outstanding common stock; a change of outstanding common stock from par to no par; and a possible consolidation, merger, or sale of the company-we have been directed to no provision in the indenture here that addresses the situation in which the company spins off a portion of its assets to a subsidiary and distributes those assets, in the form of a stock dividend, to its common shareholders. Plaintiffs are able to point to only one section in the indenture that is even arguably apposite. That provision, entitled "Notice to be Given of Record Date for Stock Dividend, etc.," provides that:
 
 
 85
 The Company covenants and agrees that it will not declare and/or pay any dividend on its common stock payable in stock or create any rights to subscribe for stock or securities convertible into stock unless in any such case notice of the taking of a record date for the determination of the stockholders entitled to receive such dividend, distribution or right is given at least ten days prior thereto by at least one publication in an Authorized Newspaper.
 
 
 86
 Indenture Article 5, Section 12 (appendix at 357a) (emphasis added).
 
 
 87
 Plaintiffs assert that the term "stock dividend" in the table of contents, as well as the words "payable in stock," which are found in the body of the provision, suggest that the clause is "in no way limited to the common stock of the B&O," but, rather, applies to distributions of MAC stock as well. Brief of Appellant at 34. Plaintiffs also contend that, even assuming the phrase "payable in stock" refers only to B&O common stock, the provision violates the New York[6] requirement of fair dealing. I find neither of these two arguments convincing.
 
 
 88
 It is a well-established principle of New York corporate law that a "stock dividend" is "any dividend payable in stock of the corporation declaring or authorizing such dividend." In re Fosdick's Trust, 4 Misc.2d 1003, 147 N.Y.S.2d 509, 514 (1955) (emphasis added), aff'd., 3 App.Div.2d 1000, 165 N.Y.S.2d 429 (1957), aff'd., 4 N.Y.2d 646, 176 N.Y.S.2d 966, 152 N.E.2d 228 (1958); 11 W. Fletcher Cyclopedia of the Law of Private Corporations § 5359 (perm. ed. 1971). The declaration of such a dividend generally is conceived of as a capitalization of surplus, which neither depletes the assets of the corporation nor increases the holdings of the stockholder. See Gibbons v. Mahon, 136 U.S. 549, 559-60, 10 S.Ct. 1057, 1058-1059, 34 L.Ed. 525 (1890); Equitable Trust Co. v. Prentice, 250 N.Y. 1, 164 N.E. 723, 725 (1928) (Cardozo, C. J.) ("When a dividend is paid in cash, the ownership of the corporate assets is changed; the company owns less, and the shareholder owns more, or something essentially different, though its value be no greater. Upon the distribution of a stock dividend, ownership of the assets is precisely as it was. 'A stock dividend does not distribute property, but simply dilutes the shares as they existed before.' "). Thus stock dividends traditionally have been distinguished "from (dividends) payable in the stock of a subsidiary" or another independent corporation. Id.; see also Kellogg v. Kellogg, 166 Misc. 791, 4 N.Y.S.2d 219, 221, aff'd., 254 App.Div. 812, 5 N.Y.S.2d 506 (1938). The latter sort of dividend-stock in subsidiaries or other corporations-is considered the equivalent of a cash dividend-"diminish(ing) the property of the corporation by exactly the amount paid out and correspondingly increas(ing) the property of the individual stockholders...." 11 W. Fletcher Cyclopedia of the Law of Private Corporations § 5355 (perm. ed. 1971) (footnote omitted).
 
 
 89
 Applying these precepts to the case at hand, it is clear that the distribution of the MAC stock was not a "stock dividend," as that term traditionally has been defined. B&O was not capitalizing surplus; it was divesting itself of a considerable portion of its assets. In practical terms, the effect of the MAC dividend was no different than if B&O had sold its non-rail assets for cash and then distributed an extraordinary cash dividend to its shareholders.[7] See Venner v. Southern Pac. Co., 279 F. 832, 840 (2d Cir.), cert. denied, 258 U.S. 628, 42 S.Ct. 461, 66 L.Ed. 799 (1922). Had the B&O indenture contained a more broadly inclusive notice clause, B&O might have been required to inform the debenture holders prior to the declaration of the MAC dividend. The sample provision quoted above, for example, requires notice both for dividends "payable in stock of any class" and for "any other distribution," excluding normal cash dividends. Kaplan, supra note 4, at 13 n.24. But the fact remains that the B&O indenture contains no such clause. Accordingly, the plaintiffs cannot rely upon the terms of the indenture as a source of B&O's purported duty to speak.
 
 
 90
 Apparently mindful of the limited protection afforded to them by the indenture, the plaintiffs maintain that, notwithstanding any lack of an adequate notice provision within the indenture, New York's law of fair dealing required that in any event notice be given prior to the declaration of the MAC dividend. Judge Gibbons credits this argument, concluding that, in failing to give notice, B&O violated the principle "that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract...." At 941 (quoting Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933)).
 
 
 91
 Such an analysis is clearly inappropriate. By its terms, the principle of fair dealing expressed in Kirke and quoted by Judge Gibbons applies only when one party infringes the other's rights "to receive the fruits of the contract." Here, under the well-settled Parkinson doctrine, Pittsburgh Terminal had no right, under the contract, to receive advance notice of the MAC dividend because no anti-dilution provision to that effect had been included in the indenture. Thus, the risk of dilution was "inherent in the investment made by the holders of Debentures.... (B&O) did nothing that could be described as 'destroying or injuring the right of the other party to receive the fruits of the contract,' because ... the benefits that the holders of Debentures received were all the rights to which they were contractually entitled." Broad v. Rockwell International Corp., supra at 958.
 
 
 92
 Van Gemert v. Boeing Co., 520 F.2d 1373 (2d Cir.), cert. denied, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975), appeal after remand, 553 F.2d 812 (2d Cir. 1977), a Second Circuit case relied upon by Judge Gibbons, does not support a contrary result. In Van Gemert, debenture holders complained that Boeing had provided inadequate notice of its intention to redeem the debentures, thereby depriving the investors of the opportunity to convert prior to redemption. The Second Circuit agreed. Observing that the newspaper notice that was provided "may have conformed to the requirements of the Indenture," the court nonetheless concluded that such notice "was simply insufficient" under New York's fair dealing law "to give fair and reasonable notice to the debenture holders." 520 F.2d at 1383. In its decision after remand, the court clarified its earlier decision:
 
 
 93
 We did find significant ... the fact that the debentures did not explicitly set forth the type of notice which appellants could expect if Boeing decided to call the bonds. Without such a declaration, we held as a matter of law that appellants were entitled to expect that Boeing would employ a method of notification reasonably calculated to inform the debenture holders of the call.
 
 
 94
 553 F.2d at 815.
 
 
 95
 Van Gemert thus stands for the narrow proposition that, if the debenture holders are contractually entitled to notice, such notice must be "fair and reasonable." But Van Gemert in no way addresses the question posed to us today: namely, whether the B&O debenture holders were entitled to any notice at all. That question, as has already been suggested, can be answered only by reference to the language of the indenture itself.
 
 II.
 
 96
 The conclusion that B&O was under no contractual obligation to provide advance notice of the MAC dividend to its convertible debenture holders does not, of course, end the inquiry. For while it is clear that, as a general rule, the debenture holders' rights are limited to those specified in the indenture, the Court today has determined that SEC Rule 10b-17 furnishes an independent statutory source from which to derive a duty, on the part of B&O, to provide notice of the MAC dividend. I turn, therefore, to an examination of this issue.
 
 Rule 10b-17 provides that
 
 97
 (a) It shall constitute a "manipulative or deceptive device or contrivance" as used in section 10(b) of the Act for any issuer of a class of securities ... to fail to give notice in accordance with paragraph (b) of this section of the following actions relating to such class of securities:
 
 
 98
 (1) A dividend or other distribution in cash or in kind, except an ordinary interest payment on a debt security, but including a dividend or distribution of any security of the same or another issuer; ....
 
 
 99
 17 C.F.R. § 240.10b-17 (1981) (emphasis added). Judge Gibbons has concluded that Rule 10b-17 applies to the situation at hand because "B&O is the issuer of the convertible debentures, the MAC distribution is a dividend of a security, and that dividend related to the convertible debentures since it was material to a decision about exercising the conversion option." At 941. Judge Garth, concurring exclusively on this ground, stresses that, in his view, "a dividend 'relates to' a security if the declaration of that dividend makes the security significantly more or less valuable...." At 945. Because the B& O debentures were of considerably less value after the declaration of the MAC dividend, Judge Garth has concluded that the declaration of the dividend "is an action which clearly 'relates to' " that class of securities.
 
 
 100
 I do not disagree that the MAC dividend may have been "material" to the debenture holders' decision whether or not to convert their securities into shares of common stock. Nor do I take issue with Judge Garth's determination that the debentures were less valuable after the declaration of the dividend. Nonetheless, in my view, these considerations are not sufficient to establish that the dividend declaration "related to" the class of debenture securities as that term is used in Rule 10b-17. Put simply, Rule 10b-17 never was meant to deal with a situation similar to that before us today.
 
 
 101
 Nothing in the Commission's "Notice of Proposed Rule Making" or in the language of the rule itself suggests that Rule 10b-17 was intended to override the common law and accord debenture holders significant additional substantive rights. When the Rule was proposed by the Securities Exchange Commission in 1971, it was described as a rule "to require companies whose securities are publicly traded to furnish public investors with timely advance notice of the right to receive dividend(s) and other rights which accrue to holders of record of a specified class of securities as of a specialized date ('the record date')." 36 Fed.Reg. 3430 (1971). In other words, the Rule was designed to ensure that purchasers of securities receive all the fruits of the transaction to which they legally are entitled -namely, distributions made after the sale but before the change in ownership is reflected in the corporation's record books.[8] Detailing the circumstances that had prompted the proposal, the Commission explained:
 
 
 102
 When an issuer establishes a record date it is, in general, obligated to furnish the cash, securities, or other property or property rights that are the subject of the distribution only to those persons owning the underlying security as reflected in the issuer's records. However, not all transactions occurring prior to that cut-off date can be settled and appropriate changes effected on the issuer's records to provide assurance that the distributions of the rights will actually be made by the issuer to purchasers. Since during this period purchasers pay a price for the underlying security which indicates the value of the asset to be distributed, it has therefore been the practice and custom of the trade for brokers and dealers to render the purchaser as the person entitled to the distribution which is made by the issuer to the seller as record owner. If the participating brokers have notice of the cut-off date, they can take necessary steps at settlement ... to protect the right of the purchaser to the distribution and at the same time alert the seller to his obligation to turn over the distributed property to the purchaser.
 
 
 103
 Id. at 3430-31 (emphasis added). The failure of publicly held corporations to provide such notice.
 
 
 104
 has had a misleading and deceptive effect on both the broker-dealer community and the investing public. As a direct result of such failure, purchasers and their brokers may have entered into and settled securities transactions without knowledge of the accrual of such rights and were thus unable to take necessary steps to protect their interests. Further, sellers who have received the benefits of such rights as recordholders on the specified record date after having disposed of their securities, have also disposed of the cash or stock dividends or other rights received as such recordholders without knowledge of possible claims of purchasers of the underlying security to those rights.
 
 
 105
 Id. at 3430.
 
 
 106
 The differences between the scenario depicted by the SEC and the present case could not be more obvious. In the situation described by the SEC, the purchaser-independent of Rule 10b-17-has accrued the right to receive certain benefits. In such a case, the Rule acts simply to assure that these rights will not be impeded because of the inadequacies inherent in corporate bookkeeping. Here, in contrast, the debenture holders have a right to convert their debentures into shares of common stock. That right has not been defeated. Under well-established common law principles, however, they have no right-unless otherwise specified in the debenture-to notice of corporate actions that may affect the value of the conversion option.
 
 III.
 
 107
 Had the debenture holders foreseen the possibility that B&O would spin off its non-rail assets, arguably they may have bargained for-and paid for-the right to advance notice of the event.[9] Despite the well-settled precedent of Pratt and Parkinson, however, the B&O indenture did not require such notice to the debenture holders and the price of the debenture presumably reflected this fact. For this Court today-almost thirty years after the drafting of the indenture-to ignore what was set forth as the intent of the parties and fundamentally to alter the terms of the contract is, in my view, not only legally erroneous but improvident.[10]
 
 I therefore respectfully dissent.[11]
 
 
 [1]
 The District Court decision is reported. Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co., 509 F.Supp. 1002 (W.D.Pa.1981)
 
 
 [2]
 446 F.Supp. 656 (W.D.Pa.1978)
 
 
 [3]
 Unpublished per curiam noted at 578 F.2d 1375 (3d Cir. 1978)
 
 
 [4]
 509 F.Supp. at 1009
 
 
 [5]
 Summary judgment was granted in favor of three directors, Stephen Muller, Nicholas T. Camicia and Cyrus S. Eaton, who did not participate in the December 13 Board actions. 509 F.Supp. at 1004. That ruling is not appealed
 
 
 [6]
 The court also dismissed Milton S. Eisenhower as a defendant because he did not participate in the December 13, 1977 Board meeting. 509 F.Supp. at 1018
 
 
 [7]
 See, e.g., International Controls Corp. v. Vesco, 593 F.2d 166, 181 n.18 (2d Cir.), cert. denied, 442 U.S. 941, 99 S.Ct. 2884, 61 L.Ed.2d 311 (1979); Davis v. Davis, 526 F.2d 1286, 1289 & n.4 (5th Cir. 1976); Fenstermacher v. Philadelphia National Bank, 493 F.2d 333, 336 n.4 (3d Cir. 1974); Walling v. Beverly Enterprises, 476 F.2d 393, 396 n.5 (9th Cir. 1973); Green v. Hamilton Intern. Corp., 437 F.Supp. 723, 727 (S.D.N.Y.1977); Camp v. Genesco, (1976-77) Fed.Sec.L.Rep. (CCH) P 95,679 at 90,336-37 (S.D.N.Y.1976). But cf. Broad v. Rockwell International Corp., 614 F.2d 418 (5th Cir. 1980), vacated upon rehearing en banc, 642 F.2d 929 (5th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 506, 72 L.Ed.2d 380 (1981). If the vacated panel opinion in Broad can be read to suggest that the holder of a debenture containing a conversion option is not a purchaser or seller, we decline to follow it
 
 
 [8]
 509 F.Supp. at 1012-13
 
 
 [9]
 The court's finding that Milton D. Eisenhower did not participate in the December 13, 1977 meeting is not clearly erroneous; indeed it is not challenged. Thus the judgment in his favor must be affirmed
 
 
 [1]
 The Rule states:
 (a) It shall constitute a "manipulative or deceptive device or contrivance" as used in section 10(b) of the Act for any issuer of a class of securities publicly traded by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange to fail to give notice in accordance with paragraph (b) of this section of the following actions relating to such class of securities:
 (1) A dividend or other distribution in cash or in kind, except an ordinary interest payment on a debt security, but including a dividend or distribution of any security of the same or another issuer;
 (b) Notice shall be deemed to have been given in accordance with this section only if:
 (1) Given to the National Association of Securities Dealers, Inc., no later than 10 days prior to the record date involved or, in case of a rights subscription or other offering if such 10 days advance notice is not practical, on or before the record date and in no event later than the effective date of the registration statement to which the offering relates.... (or)
 (3) Given in accordance with procedures of the national securities exchange or exchanges upon which a security of such issuer is registered pursuant to section 12 of the Act which contain requirements substantially comparable to those set forth in paragraph (b)(1) of this section.
 
 
 [17]
 C.F.R. § 240.10b-17 (1981) (emphasis added)
 
 
 [2]
 Rule 10b-17 is not limited to equity securities. That dividends or other distributions relating to debt securities are covered by the Rule is evident from the Rule's exclusion from its notice requirement of "ordinary interest payment(s) on a debt security." Rule 10b-17(a)(1). This clearly indicates that dividends or other distributions relating to debt securities, other than ordinary interest payments, are governed by the Rule. If Rule 10b-17 covers equity and debt securities, it must cover a mixed debt-equity security such as a convertible debenture
 
 
 [3]
 The NYSE listing agreement for the debentures, App. at 457a, entered into by the B & O on March 22, 1956, incorporates by reference an earlier listing agreement between the B & O and the NYSE, dated February 18, 1947. That earlier agreement provided:
 The Corporation (B & O) will give the Exchange at least ten days' notice in advance of the closing of the transfer books, or of the taking of a record of its stockholders for any purpose.
 The Corporation will publish promptly to the holders of any of its securities listed on the Exchange any action taken by the Corporation with respect to dividends or to the allotment of rights to subscribe or to any rights or benefits pertaining to the ownership of its securities listed on the Exchange; and shall give prompt notice to the Exchange of any such action; and shall afford the holders of its securities listed on the Exchange a proper period within which to record their interests and to exercise their rights....
 Id. at 455a. By its terms, the NYSE listing agreement unquestionably includes any action taken, including the declaration of dividends, which affects convertible debentures.
 
 
 [4]
 Thus, we need not decide whether a violation of Rule 10b-17, like a violation of Rule 10b-5, 17 C.F.R. § 240.10b-5 (1981), itself gives rise to an implied right of action for damages under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976)
 
 
 [1]
 See Green v. Hamilton Int'l. Corp., No. 76 Civ. 5433 (S.D.N.Y. July 14, 1981) ("If the wrongs alleged in this case impacted upon the securities so as to undermine the debtor-creditor relationship, a contract analysis is appropriate, and plaintiffs ... were owed no special duty outside the bounds of the contract. If the wrongs alleged impinged upon the equity aspects, then the analysis would more properly treat plaintiffs like shareholders to whom the majority shareholders and directors of a corporation owe a duty of 'honesty, loyalty, good faith and fairness.' ")
 
 
 [2]
 The Act defines the term "equity security" broadly to include "any stock or similar security; or any security convertible, with or without consideration, into such a security...." 15 U.S.C. § 78c(11). See Chemical Fund, Inc. v. Xerox Corp., 377 F.2d 107, 110 (2d Cir. 1967); In re Will of Migel, 71 Misc.2d 640, 336 N.Y.S.2d 376, 379 (1972)
 
 
 [3]
 The "indenture" is the document that sets forth the terms under which the debenture has been issued, including the redemption rights of the issuer, the conversion rights of the investor, and any number of administrative or procedural provisions. The indenture is usually conceived of as a contract between the issuer and a trustee for the benefit of the debenture holders. See generally Commentaries, supra at 7-8. Since 1939, debenture holders have been protected by federal law against breaches of fiduciary duty by the trustee. Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa et seq. (1976). See Zeffiro v. First Penn. Banking and Trust Co., 473 F.Supp. 201 (E.D.Pa.1979), aff'd., 623 F.2d 290 (3d Cir. 1980)
 
 
 [4]
 See Hills, Convertible Securities-Legal Aspects and Draftsmanship, 19 Calif.L.Rev. 1, 1-2 (1930) ("Poor draftsmanship and a disregard of possible corporate changes, rather than a general misunderstanding of the conversion privilege, may be set down as the principal causes of litigation on this subject. The decisions resulting from such litigation have acted as danger signals, attorneys have become more careful and litigation has been reduced to a minimum."); Kaplan, Piercing the Corporate Boilerplate: Anti-Dilution Clauses in Convertible Securities, 33 U.Chi.L.Rev. 1, 29 (1965) ("The anti-dilution clause is an integral and necessary part of any convertible security. The clause is a complex, difficult and intriguing exercise in corporate draftsmanship. It requires the draftsman to protect against the whole gamut of potential corporate rearrangement or manipulation which might adversely affect the rights of the holders of the convertible securities. So intricate and precise an instrument should be prepared with the greatest care and diligence.")
 
 
 [5]
 The model indenture discussed in the Commentaries includes at least two provisions that address this point. One stipulates, for example, that:
 In the event that the Company shall make any distribution of its assets upon or with respect to its Common Stock, as a liquidating or partial liquidating dividend, or other than as a dividend payable out of earnings or any surplus legally available for dividends under the laws of the state of incorporation of the Company, each Holder of any Debenture then Outstanding shall, upon the exercise of his right to convert after the record date for such distribution, or, in the absence of a record date, after the date of such distribution, receive, in addition to the shares subscribed for, the amount of such assets (or, at the option of the Company, a sum equal to the value thereof at the time of distribution as determined by the Board of Directors in its sole discretion) which would have been distributed to such Holder if he had exercised his right to convert immediately prior to the record date for such distribution, or, in the absence of a record date, immediately prior to the date of such distribution.
 Commentaries, supra, at 547 (emphasis added) (footnote omitted). An alternate provision, addressing the situation in which the corporation distributes to its shareholders "evidences of its indebtedness or assets" excluding dividends paid out of earned surplus, declares that "in each such case the Conversion Price shall be adjusted" to compensate for the distribution of the corporation's assets to its shareholders. Id. at 553.
 
 
 [6]
 As Judge Gibbons notes, the B&O indenture was entered into in New York and must be construed under the laws of that state. At 941
 
 
 [7]
 Because it is the equivalent of an extraordinary cash dividend, the distribution of the MAC stock is not governed by the provisions of Article 5, Section 2 of the Indenture, which apply only to "regular dividends" and exclude "extraordinary dividends of every character." Appendix at 348a-49a
 
 
 [8]
 The Rule presumably provides a remedy for sellers as well. See Lutgert v. Vanderbilt Bank, 508 F.2d 1035 (5th Cir. 1975). In Lutgert -the only case to my knowledge that has discussed the intended scope of Rule 10b-17-the court described "the type of claim for which Rule 10b-17 was intended to provide relief":
 For example, if the owner of ... stock prior to the record date were to sell his stock within the ten-day disclosure period referred to in Rule 10b-17 unaware, due to defendants' nondisclosure, that the record date had been set, it is conceivable that he might make out a claim for relief under Rule 10b-17. Plaintiff in such a case would have been a seller of ... stock and would have been defrauded in connection with that sale.
 508 F.2d at 1038-39.
 
 
 [9]
 Concededly, the debenture holders themselves do not, in the average case, bargain individually with the issuing corporation. See Note, Convertible Securities: Holder Who Fails to Convert Before Expiration of the Conversion Period, 54 Cornell L.Rev. 271, 272 (1969). But attorneys or investment bankers normally perform this function on behalf of the debenture holders as a class, see e.g., Hills, supra note 4; Kaplan, supra note 4, and there is no suggestion in this case that those persons who bargained on behalf of the B&O debenture holders did so other than with diligence and vigor
 
 
 [10]
 In this regard it is instructive to consider the views expressed by Judge Tyler in Entel v. Guilden, 223 F.Supp. 129, 131-32 (S.D.N.Y.1963):
 One of the chief economic functions of a corporation, obviously, is to facilitate aggregations of capital. To further this function, there has developed a broad range of modes of investment within the corporate framework. Each such mode is a bundle of legal rights and duties; the market price for each bundle is no doubt determined at least in part by what the bundle contains. Thus, courts should act with conservatism in changing the content of any of these bundles in ways which would give the holders of some bundles less, and holders of other bundles more, than was bargained for in the marketplace.
 
 
 [11]
 Judge Gibbons has posted two additional sources from which he derives a duty to speak-namely, the New York Stock Exchange Listing Agreement and the Maryland law of fiduciary obligations. While the court's holding does not rest on either of these alleged sources. I note that, for essentially the reasons stated in parts I and II of this opinion, I find that neither the listing agreement nor the Maryland law creates the asserted duty to provide notice in this context